## STATE OF MARYLAND
### *vs.*
### JOHN H. GURRY.

*Penal statutes: construction; police power; control of private property; Baltimore City; 14th Amendment to U. S. Constitution; "Segregation Ordinance"; Ordinance 692 of Mayor and City Council of Baltimore, of May 15th, 1911; regulating the residential districts of races in Baltimore City; vested rights.*

While penal statutes are to be strictly construed, their construction must not be unreasonable or forced.          p. 538

In sections 1 and 2 of the Ordinance No. 692 of the Mayor and City Council of Baltimore, of May 15th, 1911, providing for the segregation of white and colored people in different residential districts, the words "in whole or in part" modify the words "residences or places of abode," and the section means that where the buildings in a block, "so far as the same are occupied," are used in whole or in part as residences or places of abode by members of one race, then no member of the other race shall occupy any building in that block as a residence. The words "in whole or in part" apply to blocks where all of the houses are wholly occupied, as well as to blocks where, although some are vacant, the other buildings are occupied by members of one race only.                                       p. 539

Where some of the houses are partly used as residences and partly as shops and stores, or for purposes other than for residences, only portions of the houses used as residences are to be considered in determining the question as to whether or not the block shall come under the operation of the ordinance.
                                                                    p. 539

This ordinance is not a violation of section 221 of the City Charter.                                                    p. 540

It is for the preservation of peace, the prevention of conflict and ill-feeling, between the white and colored persons in Balti-

more City, and for promoting the general welfare of the City; provisions applicable to the white race are made precisely applicable to the colored race, and the ordinance does not present any case of discrimination prohibited by the 14th Amendment to the Constitution of the United States, or by Article 23 of the Bill of Rights of Maryland.                    p. 540

Ordinance No. 692 is unconstitutional, however, because its provisions are made applicable to property owned before its passage; under the guise of the police power, it is a taking away of vested rights.                    pp. 550, 551

It is not to be presumed that the Legislature meant to confer upon the City the power to prohibit by ordinance one who was the owner of a dwelling when the ordinance was passed, from moving into it, simply because he is of a different color from other persons using the block, in which his house is situated as a dwelling or place of abode.                    p. 551

The object of section 221 of the City Charter, providing that every ordinance enacted shall contain but one subject which shall be described in its title, as in the case of section 29 of Article 3 of the Constitution, is to prevent the incorporation in one Ordinance of distinct and separate matters of legislation having no connection with each other, and not referred to in the title.
                    p. 540

Under its Charter, the City of Baltimore, in the exercise of the police power, has the same power to pass ordinances for the maintenance of the peace, good government, health and welfare of the City as the Legislature has to enact statutes for that purpose.                    p. 540

The Mayor and City Council of Baltimore has the power to pass ordinances for the segregation of races in Baltimore City.
                    p. 548

In determining the constitutionality of an ordinance passed under the exercise of the police power, courts must take into consideration the reasonableness of their provisions, and determine whether or not they are so reasonable or oppressive as to cause the assumption that the Legislature did not intend to empower the municipality to enact them.                    p. 541

The 14th Amendment to the Constitution of the United States does not take from the states the police power that they possessed before the Constitution was adopted; and the states still possess those powers subject to the observance of the fundamental principles of civil rights.                              p. 544

The absolute control of property by an owner may be subject to reasonable regulations under the police power of the State; and the owner may not use his property as he pleases, if such use injuriously affects others.                              p. 550

*Salus populi, suprema lex.*                              p. 542

*Decided October 7th, 1913.*

Appeal from the Criminal Court of Baltimore City (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Edgar Allan Poe, the Attorney General, Wm. L. Marbury* (with whom was *W. L. Rawls,* on the brief), and *S. S. Field, the City Solicitor* (upon the invitation of the Attorney General and by special leave of the Court; Mr. Field filed also a supplemental brief), for the appellant.

*W. A. Hawkins* (with whom was *Geo. W. F. McMechen,* on the brief), and *C.* Ames Brooks (with a supplemental brief), for the appellee.

CONSTABLE, J., delivered the opinion of the Court.

There is involved in this appeal the validity of the ordinance of the Mayor and City Council of Baltimore City, known as the Segregation Ordinance (City Ordinance No. 692, May 15th, 1911).

The appellee, a colored man, was indicted for violation of section 2 of said ordinance and upon the lower Court sustaining a demurrer to the indictment, this appeal was taken from the judgment thereupon entered.

The ordinance, which is composed of ten sections, is entitled "An ordinance for preserving peace, preventing con-

flict and ill feeling between the white and colored races in Baltimore City, and promoting the general welfare of the city by providing so far as practicable, for the use of separate blocks by white and colored people for residences, churches and schools."

Section 1 provides: "That from and after the passage of this ordinance it shall be unlawful for any white person to move into or use as a residence or place of abode any house, building or structure, or any part of any house, building or structure situated or located on any block, as the same is hereinafter defined in section 4, the houses, buildings and structures on which block, so far as the same are occupied or used as residence or places of abode, in whole or in part shall be occupied or used as residences or places of abode by colored persons, otherwise than as provided in section 3 hereof. Such a block shall be deemed a colored block for the purposes of this ordinance."

Section 2 is in the identical language of section 1, except that it prohibits any colored person from doing what section 1 prohibits any white person from doing.

Section 3 excepts domestic servants from the operation of sections 1 and 2 when they reside with their employers.

Section 4 is, "That the word 'blocks' as the same is used in this ordinance shall be construed to mean that portion of any street or alley upon both sides of the same between the two adjacent intersecting or crossing streets." And further provides the method, in cases where either of the adjacent streets intersects but does not cross the street upon which the block in question may be located, by which that portion of the block on the side of the street facing the intersecting street is to be classified.

Section 5 fixes the penalty for violation of the prohibitions of sections 1 or 2 of the ordinance.

Section 6 provides the manner of determining whether blocks upon which there were no buildings used as residences at the time of the passage of the ordinance, but upon which it is desired by the owners thereof to erect buildings for the

purposes of residences, shall become either colored or white blocks.

Section 7 provides the means whereby blocks which were either white or colored under sections 1 and 2 can be opened to the occupancy of both white and colored persons.

Sections 8 and 9 provide that no buildings, not so used prior to the passage of the ordinance, shall be used as churches or schools without a permit from the Board of Police Commissioners and no permit shall be issued to allow the use of such buildings by colored persons in a white block or white persons in a colored block.

Section 10 provides that nothing in the last four sections shall be taken to affect the validity of the first five sections.

The learned judge below, in sustaining the demurrer, filed an opinion, from which it appears that the reason for the Court's action was based upon the unenforceability of the ordinance because of the uncertainty of the language of sections 1 and 2.

There can be no question, that this being a penal ordinance, it must be strictly construed; but this rule is open to the limitation that the construction must not be an unreasonable or forced one. As was declared in *Keller* v. *State*, 11 Md. 525: "Even penal statutes which it is said should be strictly construed, ought not to be so strictly construed as to defeat the obvious intention of the Legislature. And though they are not to be extended by construction, they should receive a rational interpretation."

In *Wharton's Criminal Law* (10th Ed.), sec. 28, the rule is stated thus: "Penal statutes are to be strictly construed. In construing such statutes, however, we are to look for their reasonable sense, and if this is clearly ascertained it must be applied though a narrower sense is possible."

In the opinion of the Court we find this language: "In an effort to interpret these sections (1 and 2) we are forced to the conclusion that the thing prohibited is the residence of a white person in a block occupied, in whole or in part, by colored persons, or the residence of a colored person in a

block occupied, in whole or in part, by white persons." From which, and also other portions of the opinion, it is apparent that the words "in whole or in part" were taken to modify the word block. But this is a construction to which we cannot accede. Although at a casual reading of these two sections the language does apparently admit of this construction, nevertheless, upon close scrutiny it is clear that the words "in whole or in part" were used to modify the words "residences or places of abode." Therefore the meaning of the language of the sections is plain that the thing prohibited is, that when the buildings on a block, "so far as the same are occupied or used as residences or places of abode, in whole or in part, shall be occupied or used as residences or places of abode" by the members of one race, that then no member of the other race shall occupy any building on that block as a residence. The effect of the words "in whole or in part" being to cover blocks where all of the houses were wholly occupied as well as where there were some vacant, but all that were occupied, being occupied by the members of the same race. Or where some of the houses were partly used as residences and partly as shops, stores or other purposes other than residences, that in that event the only portion of the house to be considered in determining as to whether or not the block should come under the operation of the ordinance was to be the portion used as residences. The blocks, which at the time of the passage of the ordinance were occupied by both white and colored, are left entirely free for the same character of occupancy. Although language could have been used to make the meaning clearer, we are of the opinion that these sections are free from uncertainty, and therefore it was error to have declared the ordinance void for that reason.

The appellee contends that the ordinance is in conflict with sec. 221 of the City Charter, p. 360, wherein it is provided: "Every ordinance enacted by the City shall embrace but one subject, which shall be described in its title, etc." This has been declared to be an adaptation of Article 3, section 29 of the State Constitution. There have been so many adjudica-

tions upon that section that there can no longer be any doubt as to its correct interpretation. And what was said in the case of *Gans* v. *Carter,* 77 Md. 1, seems to be applicable here: "We have but a word to say and that is to repeat what we have so often said, that the object of this clause was to prevent the embodying into the same act distinct and separate matters of legislation, having no connection whatever with each other and matters not referred to in the title." Measured by this standard there can be no force in the contention.

The main question in this case arises, however, over whether the provisions of this ordinance are in conflict with Article 23 of the Bill of Rights of the Constitution of Maryland, and the first section of the Fourteenth Amendment of the Constitution of the United States.

The title to the ordinance recites its purposes to be "for preserving peace, preventing conflict and ill feeling between the white and colored races in Baltimore City, and promoting the general welfare of the City," etc. What is applicable to the white race is made precisely applicable to the colored race. No advantage that is enjoyed by one race is denied the other. Every restriction placed upon the one is in exact terms imposed upon the other.

Upon whether or not this ordinance is a valid exercise of the police power must depend its enforceability.

That the City has the power under its Charter to pass ordinances in the exercise of the police power, equal to legislative enactments, must be regarded as settled in this State since the case of *Rossberg* v. *State,* 111 Md. 394, wherein this Court said: "Broader or more comprehensive police powers could not be conferred under any general grant of police power, for the purposes mentioned in section 18, than those granted in that section, and when we consider the 'Welfare Clause' of the Charter, section 31, greater emphasis could not be laid upon the implied powers of the City for the maintenance of the peace, good government, health and welfare of the City than is there laid * * * In the present case, the legislative grant is not merely one of power to pass ordinances relating

to specified police powers, regarded as a part only of the general police power, but the grant is of all the power commonly known as the police power, to the same extent as the State has or could exercise said power within said limits. The implication therefore is a necessary one, that notwithstanding the preceding clause of that section of the Charter enumerated certain purposes for which ordinances might be passed, the Legislature intended the City to have, in addition, the power to pass ordinances for any and all purposes relative to the exercise of the police power."

If then the Legislature could pass a statute under the police power of the State, providing for the segregation of the races, as we think it could, there would seem to be no doubt that the Mayor and City Council of Baltimore can pass a valid ordinance having the same end in view. It is true, however, that, notwithstanding the broad powers vested in the Mayor and City Council by the charter, some distinction is made between statutes passed by the Legislature and ordinances passed by a municipality under the police power—one illustration of which is what was said by CHIEF JUDGE McSHERRY in *State* v. *Hyman,* on page 618 of 98 Md. The Court must undoubtedly take into consideration the reasonableness of the provisions of this ordinance and determine whether any of those involved in this case are so unreasonable or oppressive as to cause it to assume that the Legislature did not intend to empower the municipality to enact them as they stand—whatever may be said as to the Court's powers in construing statutes which have a real and substantial relation to any object properly within the police powers of the State.

Both State and Federal Courts have been most industrious in dealing with the many cases growing out of the laws claimed to have been passed in the exercise of this power, known as the police power, and it might be well to consider what is meant, in a constitutional sense, by that term. As was said by that learned jurist, CHIEF JUSTICE SHAW, in *Commonwealth* v. *Alger,* 7 Cush. 53: "It is much easier to per-

ceive and realize the existences and sources of this power than to mark its boundaries, or prescribe limits to its exercise." And the definition there given has been, probably, more often quoted with approval than any other. "The power vested in the Legislature by the Constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with or without penalties, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth and of the subjects of the same." In *Champer* v. *Greencastle,* 138 Ind. 339, it is thus defined: "The police power of the State, so far has not received a full and complete definition. It may be said, however, to be the right of the State to prescribe regulations for the good order, peace, health, protection, comfort, convenience and morals of the community, which do not encroach on a like power vested in Congress by the Federal Constitution or which do not violate any of the provisions of the organic law." In *State* v. *Wagener,* 77 Minn. 483: "The power to impose such restrictions upon private rights as are practically necessary for the general welfare."

In *Deems* v. *Baltimore City,* 80 Md. 173, this Court said: "Every well organized government has the inherent right to protect the health and provide for the safety and welfare of its people. It has not only the right, but it is a duty and obligation which the sovereign power owes to the public * * * It may be said to rest upon the maxim *'salus populi, suprema lex'* and the constitutional guarantees for the security of private rights * * * have never been understood as interfering with the power of the State to pass such laws as may be necessary to protect the health and provide for the safety and good order of society. 'Property of every kind' says MR. JUSTICE STORY 'is held subject to those general regulations which are necessary for the common good and general welfare.' And the Legislature has the power to define the mode and manner in which every one may use his property." In *State* v. *Hyman,* 98 Md. 596, "The exercise of the police power being for the promotion of the public good is superior

to all considerations of private rights or interest, and by
virtue of it the State may lawfully impose upon the exercise
of private rights such burdens and restraints as may be nec-
essary and proper to secure the general health and safety."
In *Police Commr.* v. *Wagner,* 93 Md. 191, the Court said:
"The State has power to pass such laws as are necessary to
protect the health, morals or peace of society." In *Cochran* v.
*Preston,* 108 Md. 220, "The power to prescribe regulations
demanded by the general welfare for the common protection
of all is known as the police power of the State and is in-
herent in every sovereignty."

The Supreme Court has, times almost without number,
been called to pass upon laws enacted by the States upon mat-
ters relating to their internal government, and has given
expression to the meaning to be ascribed to the police power.
In the *Slaughter House Cases,* 16 Wall. 62, which were the
first cases involving a construction of the Fourteenth Amend-
ment, the Court said: "This power is and must be from its
very nature incapable of any very exact definition or limita-
tion. Upon it depends the security of social order, the life
and health of the citizens, the comfort of an existence in a
thickly populated community, the enjoyment of private and
social life and the beneficial use of property." "It extends"
says another eminent judge "to the protection of the lives,
limbs, health, comfort and quiet of all persons, and the pro-
tection of all property within the State," "and persons and
property were subjected to all kinds of restraints and bur-
dens in order to secure the general comfort, health and pros-
perity of the State. Of the perfect right of the Legislature
to do this no question ever was, or upon acknowledged prin-
ciples, ever can be made so far as natural persons are con-
cerned."

In the case of *Beer Co.* v. *Mass.,* 97 U. S. 25, it was said:
"Whatever difference of opinion may exist as to the extent
and boundaries of the police power * * * there seems to be
no doubt that it does extend to the protection of the lives,
health and prosperity of the citizens, and to the preservation

of good order and public morals." Again in *District of Columbia* v. *Brooke,* 214 U. S. 138: "It is the most essential of powers, at times the most insistent and always one of the least limitable of the powers of government." It may be said in a general way that the police power extends to all the great public needs. It may be put forth in aid of what is sanctioned by usage, or held by prevailing morality or strong and preponderating opinion, to be greatly and immediately necessary to the public welfare." *Noble Bank* v. *Haskell,* 219 U. S. 104. In *Barbier* v. *Connolly,* 113 U. S. 27, the Court said: "But neither the Amendment (14th)—broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the State, sometimes called the police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people." In *Chicago, B. & Q. R. Co.* v. *Drainage Com.,* 200 U. S. 592: "We hold that the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety." In *Crowley* v. *Christensen,* 137 U. S. 86, the Court said in dealing with the extent of the police power: "The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is then liberty regulated by law."

It is not, nor can it be, contended that the Fourteenth Amendment took from the States the police power they possessed at the time of the adoption of the Constitution. They now possess the power to the same extent subject, of course, to the fundamental principles of civil rights. *Slaughter House Cases, supra; Barbier* v. *Connolly, supra: Mugler* v. *Kansas,* 123 U. S. 623; *Jacobson* v. *Mass.,* 197 U. S. 25.

"It does not deprive the States of the right to preserve order within their limits, to pass laws against crimes and punish offenders, to regulate relations between individuals, to control for the public good the use of private property, to protect the health, life and safety of the people, and to that end, not only to enact suitable legislation, but to destroy property that is dangerous to the well being of the State." *Cooley's Const. Law* 251.

That this power is far reaching and most important to the preservation of the States cannot be denied. It has been impossible to confine its operation to a set rule, but every community has been left to meet the circumstances of each case as the conditions changed and to determine upon the necessity for action. *Allgeyer* v. *Louisiana,* 165 U. S. 590.

There is, however, the constant warning present, practically, in all the cases, in the examples and rule, that the exercise of the power must not be unreasonable, but must be enacted in good faith for the promotion of the public good, and not for the oppression or annoyance of a particular class. *Plessy* v. *Ferguson,* 163 U. S. 555.

If legislative bodies, under the guise of protecting the public welfare, arbitrarily pass laws which have no relation to that object, the Courts will determine whether there was a proper exercise of the power. *Mugler* v. *Kansas, supra; Lawton* v. *Steele,* 152 U. S. 133. Naturally, at times, the exercise of this power limits to some extent the enjoyment of the fundamental rights, but if the restraints are deemed by the law-making body necessary for the general welfare and are not "so arbitrary as to be palpably and unmistakably in excess of any reasonable exercise of the authority conferred," the Courts will not interfere, for the local authorities are primarily the judges of the necessity of such legislation. And although Courts may disagree as to the propriety of the legislation, unless it plainly, and beyond all question, exceeds the power, there should be no judicial interference. *Schmidinger* v. *Chicago,* 226 U. S. 578; *Minn.* v. *Barber,* 136 U. S.

313; *Atkin* v. *Kansas,* 191 U. S. 207; *McLean* v. *Arkansas,* 211 U. S. 547; *Eubank* v. *Richmond.* 226 U. S. 137.

If then this power is inherent in every State for the preservation of its general welfare, is the ordinance in question an unreasonable exercise of it and are its provisions so arbitrary and oppressive that they amount to the invasion of a person's constitutional rights?

As we have seen the avowed object of the ordinance is to preserve peace, prevent conflict and ill feeling between the two races and thereby promote the welfare of Baltimore. The means employed are that blocks which were occupied by colored people exclusively should continue to be occupied by them exclusively, and that blocks occupied exclusively by white people should so continue to be occupied by them.

The ordinance does not legislate on what were "mixed blocks"—those occupied by members of the two races—at the time it was passed, and whatever other objections may be urged against it, it cannot be truly said that there is any discrimination in the ordinance against the colored race. Indeed in its practical operation it would be more burdensome on white people than on colored people, for it is well known that white people own the great bulk of property in Baltimore City, and hence where the property of one colored person would be affected by such an ordinance those of many more white people would be. What is denied one class is denied the other, what is allowed one class is allowed the other. There is therefore no such discrimination as is prohibited by the Constitution or statutes securing civil rights, and it is not necessary to discuss that question further.

No intelligent observer in communities where there are many colored people can fail to notice that there are sometimes exhibitions of feelings between members of the two races which are likely to, and occasionally do, result in outbreaks of violence and disorder. It is not for us to say what this is attributable to, but the fact remains—however much it is to be regretted—and if a segregation of the races to such extent as may be permissible under the Constitution and laws

of the land will have a tendency not only to avoid disorder and violence, but to make a better feeling between the races, everyone having the interests of the colored people as well as of the white people at heart ought to encourage rather than oppose it. Mr. Justice Brown said in *Plessy* v. *Ferguson,* 163 U. S. 537: "The object of the amendment (14th) was undoubtedly to enforce the absolute equally of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either."

If the welfare of the city, in the minds of the Council, demanded that the two races should be thus, to this extent, separated and thereby a cause of conflict removed, the Court cannot declare their action unreasonable. It was acknowledged by the counsel for the appellee, both in the brief and in verbal argument, that for years there had been more or less friction resulting from the occupancy by colored people of houses in blocks theretofore occupied wholly by white people. With this acknowledgment how can it be contended that the City Council, charged with looking to the welfare of the city, is seeking to make an unreasonable use of the police power, when it enacts a law which, in their opinion, will tend to prevent the conflict?

As was said in *Plessy* v. *Ferguson, supra,* which was a case involving separate railroad coaches for white and colored persons within the limits of a State: "So far than as conflict with the Fourteenth Amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the Legislature. In determining the question of reasonableness it is at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the promotion of their comfort and the preservation of the public peace and good order." And further said they could not say

that such a separation was unreasonable or obnoxious to the Fourteenth Amendment.

A large number of the States have laws regulating, like in the foregoing case, the separation of the races in railroad cars, including our own State. *Hart* v. *State,* 100 Md. 595.

The Courts have uniformly held that this was a reasonable exercise of the police power, and was not a discrimination when the same accommodations were provided for each race.

Penalties in criminal laws are not only imposed to punish violators but to deter the commission of crime. If, as is practically conceded in this case, the living in such close proximity produces friction that is liable to result in open clashes and disorder, why should not the governing body take cognizance of it and legislate to avoid it and thereby promote the general peace? It seems that it would be the better exercise of their discretion, for the public welfare, to discourage by removing the cause than to trust to deterring by the fear of punishment.

In this State, as well as in a number of others, there has been a statute in force for many years prohibiting marriages between white and colored persons, and imposing a heavy penalty for its violation, and in *Plessy* v. *Ferguson, supra,* the Supreme Court said: "Laws forbidding the intermarriage of the two races may be said in a technical sense to interfere with the freedom of contract, and yet have been universally recognized as within the police power of the State." That case as well as many others has also recognized the right of States to establish separate schools for white and colored children and, as we have seen, to require the separation of the white and colored races in public conveyances. Without giving other illustrations of the exercise of the police power, we are of the opinion that the object sought to be accomplished by this ordinance is one which properly admits of the exercise of the police power. It only remains for us to determine whether the ordinance as drawn should be sustained.

It will be observed that the first five sections of the ordinance do not depend, for their validity, upon the remaining sections which legislate on subjects germane to but not essential to, sections 1 and 2. As the indictment is for the alleged violation of section 2, which is in the precise language of section 1 (excepting the latter is applicable to white persons and the former to colored persons) those two are the most important sections for our consideration. The serious objection to them is that they wholly ignore all vested rights which existed at the time of the passage of the ordinance. Prior to that time any white person undoubtedly had the right not only to own, but to move into and use as a residence or place of abode any house, etc., situated in what is by section 1 made a colored block, and a colored person had the same rights as to what is by section 2 made a white block. If the traverser, for example, on May 15th, 1911, when the ordinance was passed, owned a dwelling in what was made a white block, he could not under the ordinance move into it, although it was perfectly lawful for him to own it when he became owner, and to use it as a dwelling. He might be unable to rent it to a white person, and as a colored person was prohibited from moving into it, he could not rent it to a colored person, and he could not under the ordinance move into it himself. The result would be that his house would remain idle, unless he could sell it, which would under the circumstances likely be at a great sacrifice, although when he acquired it he had the right under the Constitution and laws of Maryland to occupy it as his dwelling, or to rent it to any person, white or colored, to be used for legitimate purposes. Or it might be that a white person had a valuable and attractive house in a "block" which was otherwise occupied by colored people, yet if at the passage of the ordinance it happened to be unoccupied as a dwelling, he could not under the ordinance move into it or rent it to a white person. To deny him such rights would be a practical confiscation of his property, for his house might be of a character he would not rent to a colored person, and if he could

not use it himself he would be deprived of not only the income from it, but of such use of it as is guaranteed to every owner of property by the Constitution and laws of the land. Of course the same conditions might exist when the owner of the one house was colored and the other residents of the block were white, although probably not so likely to happen.

We do not loose sight of the fact that the absolute control of property by an owner may be subject to reasonable regulations under the police powers of the State. An owner of property cannot establish a bawdy house or other nuisance in it because he is the owner of it. He cannot necessarily use it just as he pleases, if such use thereby injuriously affects others. He may be prohibited from using it while it is in such condition that the use of it will be dangerous, or, in some cases, will be injurious to others. He may be prohibited from manufacturing or selling intoxicating liquors in it. Other instances might be given of the exercise of the police power, but we have not hitherto known of a case which approached the exercise of such power as is contended for under this ordinance—to prohibit one who was the owner of a dwelling when the ordinance was passed from moving into it, simply because he is of a different color from other persons using that block as residences or places of abode, although he might keep his premises in better sanitary condition and in every way more attractive than the others. He may be quite as well behaved and as law abiding as the other residents of the block, he may have paid more for his house than the others for their respective houses, or may have inherited the family residence. It is not because there is any reason why it could not or should not be used as a dwelling, but simply because he is white and the others colored. Such an ordinance may work some hardships even as to after-acquired property, but if property is acquired when valid laws or ordinances affecting it are in force, it is taken subject to them. Under sections 1 and 2 of the ordinance the most serious consequences might follow their adoption and rights which had always existed be taken away by the action

of the municipality. Without deeming it necessary to con-
sider whether it would be possible for the Legislature itself
to thus take away such vested rights under the exercise of the
police powers, we deem the provisions as they were passed too
unreasonable to permit us to assume that the Legislature
intended to confer on the municipality the power to thus
affect vested rights. Indeed when we see such provisions as
those in section 7, which provide for a majority of the owners
of either real or leasehold property in a block subject to the
operations of sections 1 or 2 having the Inspector of Build-
ings declare that said block is no longer subject to the opera-
tion of such sections, it would be difficult to conclude from
the ordinance itself that the Mayor and Council were so
convinced of the necessity for such an exercise of the police
powers as would justify such interference with vested rights.

A practical difficulty in the enforcement of sections 1 and
2 which occurs to us is the lack of any provision in the ordi-
nance for some sufficient public notice of what blocks are
affected, which are to be white and which colored. Unless
there be some public record giving the necessary information
there would probably be great confusion in the examination of
title and passing on the rights of purchasers, even if no diffi-
culties arise in the enforcement of such sections.

We do not understand why in section 3 the exception was
limited to domestic servants or just how comprehensive that
term was intended to be. It would be difficult to include care
taker, chauffeur or janitor in the term "domestic servants,"
but as the validity of the ordinance is not thereby affected we
will not discuss that further.

As the case before us does not involve the provisions of
sections 6, 7, 8 and 9 we will not discuss them separately, or
pass upon the validity *vel non* of such provisions as the dele-
gation of powers attempted by sections 6 and 7 to property
owners, etc., but for the reasons stated we will affirm the
judgment.

*Judgment affirmed.*