## CONSTITUTIONAL LAW

### EQUAL PROTECTION – REJECTING THE CONTINUING VALIDITY OF PRIOR OPINIONS THAT UPHELD OR APPLIED RACIALLY DISCRIMINATORY LAWS

November 21, 2022

*The Honorable Bill Ferguson, President of the Senate*
*Maryland General Assembly*

*The Honorable Adrienne A. Jones, Speaker of the House*
*Maryland General Assembly*

Earlier this year, we commenced a review of the validity of prior official opinions of the Attorney General that upheld or applied racially discriminatory Maryland laws that were later found to be unconstitutional. This inquiry was inspired by a recent opinion of the former Virginia Attorney General, Mark R. Herring, who analyzed whether prior opinions in that state that "relied upon—or promoted—racially discriminatory laws" were "still in effect." Va. Op. Att'y Gen. No. 21-103, 2022 WL 173637 (Jan. 12, 2022), https://www.oag.state.va.us/files/Opinions/2022/21-103-Locke-and-Bagby-Issued.pdf. Like the Virginia Attorney General, we conclude that some of the prior opinions of the Attorney General of Maryland are no longer good law. More specifically, in searching for prior opinions of the Attorney General that upheld or applied racially discriminatory laws, we found many such opinions that either explicitly relied on or implicitly accepted two discriminatory legal principles that we now recognize as abhorrent to the Constitution: (1) the notion that the State may restrict interracial marriage and (2) the doctrine of "separate but equal" in public facilities, especially public education. To the extent that any prior opinions explicitly or implicitly upheld either of these clearly invalid legal principles, we expressly overrule them.[1]

---

[1] We note that, in some instances, these opinions may have applied other principles, such as the standard rules of statutory interpretation. These opinions also sometimes involved analysis that can be separated from the analysis that upheld or applied the discriminatory law at issue. To be clear, we are focused here on the parts of these prior opinions that explicitly or implicitly upheld racially discriminatory laws that we now understand to be unconstitutional, or explicitly or implicitly upheld the invalid legal principles that served as the basis for those laws. We express no view as to any other aspects of those opinions.

# I
# Background

Maryland, like many states, has a long and unfortunate history of racially discriminatory laws. In 1664, for example, the colonial General Assembly passed a statute providing that all Black persons in Maryland would be enslaved for life, codifying a practice that had already existed for decades. 1664 Md. Laws, at 533-34; *see also* Ross M. Kimmel, *Blacks Before the Law in Colonial Maryland*, ch. 3 (Jan. 24, 1974) (M.A. thesis, Univ. of Md.), https://msa.maryland.gov/msa/speccol/sc5300/sc5348/html/chap 3.html (last visited Oct. 26, 2022). Although a free Black population eventually developed in the State, free Black Marylanders during the time before the Civil War could not vote and could be sold back into slavery if they were unemployed. *See* Maryland State Archives, *A Guide to the History of Slavery in Maryland* 10 (2007), https://msa.maryland.gov/msa/intromsa/pdf/slavery_pamphlet.pdf.

The Constitution of 1864 abolished slavery in Maryland, *see* Md. Decl. Rights Art. 24 (1864), but legally sanctioned racial discrimination persisted. For example, as we discuss in more detail below, Maryland maintained a segregated system of public education until the Supreme Court held such systems unconstitutional in 1954, and the State restricted certain interracial marriages until just before such laws were also held unconstitutional in 1967. State and local governments enacted other "Jim Crow" laws as well, such as laws mandating the segregation of railroad passenger cars, 1904 Md. Laws, ch. 109; 1908 Md. Laws, ch. 248, restricting voting rights under a "grandfather clause" in certain local elections, 1908 Md. Laws, ch. 525, and segregating residential neighborhoods, Baltimore City Ord. No. 692 (May 15, 1911).[2] Only during the era of the Civil Rights Movement did the trend of discriminatory laws begin to reverse in a significant way, with the enactment of civil rights legislation such as a prohibition on discrimination in places of public accommodation. 1964 Md. Laws (1st Spec. Sess.), ch. 29.

Of course, legally sanctioned racial discrimination in Maryland was not limited to discrimination against Black people. For example, the colony of Maryland did not recognize the property rights of the Indigenous peoples who inhabited what is now Maryland at the time of English colonization, *see* Robert J.

---

[2] At the State level, however, multiple attempts to add a "grandfather clause" to the State Constitution failed. *See* Garrett Power, *Eugenics, Jim Crow and Baltimore's Best*, 49 Md. Bar J. 4, 8 (Nov. 2016).

Miller, *The Doctrine of Discovery in American Indian Law*, 42 Idaho L. Rev. 1, 23 (2005), and these Indigenous peoples were gradually forced out of the colony or onto reservations that were later abolished, *see* Maryland Manual, "Native Americans," https://msa.maryland.gov/msa/mdmanual/01glance/native/html/01 native.html (last visited Oct. 27, 2022); *see also* Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Peter A. Hammen, at 4 & n.3 (Mar. 31, 2009). In addition, members of other racial and ethnic groups were sometimes grouped into the disfavored legal category of "colored." *See, e.g.*, *State v. Gurry*, 121 Md. 534, 552 (1913) (discussing discrimination between people who were categorized as "white" and those categorized as "colored"); *see also* Isabel Wilkerson, *Caste* 122-27 (2020) (discussing shifting boundaries of the "white" category throughout U.S. history). Certain groups were also singled out for discrimination, such as members of the "Malay race," who were prohibited from marrying white or Black people in Maryland in 1935. *See* 1935 Md. Laws, ch. 60.

In more recent years, the State and our Office have attempted not only to eliminate discrimination going forward but also to confront the discrimination of the past. For example, in 2007 the General Assembly formally expressed "profound regret for the role that Maryland played in instituting and maintaining slavery and for the discrimination that was slavery's legacy." 2007 Md. Laws, Joint Res. 1. Indeed, our Office has supported the work of addressing the State's history of discrimination by, for example, helping to staff the Maryland Lynching Truth and Reconciliation Commission. 2019 Md. Laws, ch. 41, § 1(d)(2). But we also have a responsibility to acknowledge our Office's own past actions that might have perpetuated racial discrimination in the State. To that end, we have reviewed the official opinions of the Office of the Attorney General, dating back to the first published volume in 1916, to search for any opinions that might have applied, interpreted, or upheld racially discriminatory laws.[3]

As much as we might prefer otherwise, our research showed that the Office of the Maryland Attorney General was sometimes complicit in the State's history of racial discrimination. Both before and during the Civil Rights Movement, prior Attorneys General were asked questions about the interpretation and the

---

[3] Although the Attorney General undoubtedly issued written opinions prior to 1916, the first published volume of opinions was issued that year, which is the same year that the Department of Law (the predecessor of our Office) was first created. We thus began our review with 1916.

enforceability of racially discriminatory laws. In particular, our predecessors were asked on several occasions about Maryland's laws prohibiting interracial marriage and its laws imposing racial segregation in the State's public schools. As we shall see, in some cases, the opinions explicitly advised that racially discriminatory laws should continue to be enforced and, in other cases, interpreted or applied racially discriminatory laws or legal principles without acknowledging or grappling with the constitutional problems they raised.

## II
## Analysis

Our Office's published opinions serve as the official pronouncements of the Attorney General on questions of law. *See* Md. Const., Art. V, § 3(a)(4). Although these official opinions are not binding on the courts, they "serve as important guides to those charged with the administration of the law." *Mitchell v. Register of Wills*, 227 Md. 305, 310 (1962). Thus, we ordinarily "stand[] by [our] precedent, much as a court would," and we "will not overrule a prior opinion simply because we might have resolved a close question the other way." 72 *Opinions of the Attorney General* 200, 202 (1987). "At the same time, we will not perpetuate a significant mistake in legal reasoning" and are always "prepared to recognize that a prior opinion has been eroded by changed circumstances." *Id.*

With those principles in mind, we consider the continuing validity of prior opinions of the Attorney General that involved racially discriminatory laws. Based on our research, these opinions fell into two general categories: those involving laws that restricted interracial marriage and those involving school-segregation laws. We discuss each category of opinions in turn.[4]

### A.  *Laws Restricting Interracial Marriage*

In 1664, Maryland enacted its first law restricting interracial marriages. That law was specifically designed to prevent marriage between white English women and enslaved Black men. Kimmel, *supra*, ch. 3. Over the ensuing centuries, Maryland continued to pass similar laws. *See, e.g.*, 1884 Md. Laws, ch. 264 (prohibiting "marriages between white persons and persons of negro descent to

---

[4] In some cases, even when the result and the legal reasoning of an opinion may not have been discriminatory, the opinions used outdated or racist terminology. *See, e.g.*, 54 *Opinions of the Attorney General* 207 (1969). We disavow the use of such language.

the third generation"); 1935 Md. Laws, ch. 60 (prohibiting a white or Black person from marrying a person of the "Malay race"). In fact, the State had such a law on the books until just days before the Supreme Court held, in *Loving v. Virginia*, 388 U.S. 1 (1967), that such laws violated the United States Constitution. *See* 1967 Md. Laws, ch. 6, § 3 (repealing the law restricting interracial marriages, effective June 1, 1967); *Loving*, 388 U.S. at 1 (noting that the opinion was issued on June 12, 1967). That law provided, in relevant part:

> All marriages between a white person and a negro, or between a white person and a person of negro descent, to the third generation, inclusive, or between a white person and a member of the Malay race or between a negro and a member of the Malay race, or between a person of negro descent, to the third generation, inclusive, and a member of the Malay race, are forever prohibited, and shall be void.

Md. Code, Art. 27, § 398 (1967). Before the Supreme Court's decision in *Loving*, the Office of the Attorney General was asked about these laws on several occasions.

For the most part, the Office interpreted these laws without expressly considering their constitutionality. For example, in a 1928 opinion, the Clerk of the Court of Common Pleas asked if it was proper to issue a marriage license to a white man and a woman whose paternal grandparents were Black. 13 *Opinions of the Attorney General* 164, 164 (1928). The Attorney General at the time responded that Maryland law prohibited a Black person from marrying a white person and advised the clerk to refuse to issue the license, but the opinion did not consider whether the statute was constitutional. *Id.* Similarly, in 1940, the then-Attorney General opined that State law prohibited a white woman from marrying a Filipino man, again without considering whether the prohibition was constitutional.[5] 25 *Opinions of the Attorney General* 127, 127-28 (1940); *see also* 18 *Opinions of the Attorney General* 346, 347

---

[5] In the same opinion, the Office concluded that there was no prohibition on marriages between a Japanese person and a white person or between a Chinese person and a white person. But that was because there was no statutory prohibition on such marriages, not because our predecessors thought that such a prohibition would raise any constitutional issues. 25 *Opinions of the Attorney General* at 128.

(1933) (mentioning without further comment, in an opinion about a different topic related to marriage and divorce, that Maryland law prohibited marriages between a white person and a Black person or a person with Black ancestry).

In other instances, however, the Office acknowledged the constitutional questions raised by these discriminatory laws but nonetheless proceeded to treat them as enforceable or advise that they should continue to be enforced. For example, in 1961, the clerk for the Circuit Court for Harford County asked if his office should continue to refuse marriage licenses to interracial couples when their marriage would be prohibited under Maryland law, and the then-Attorney General advised that the clerk should indeed continue to enforce the State's law prohibiting certain interracial marriages. 46 *Opinions of the Attorney General* 44, 44-48 (1961). The Attorney General concluded that he could only advise that existing laws enacted by the General Assembly were unconstitutional "where there has been the clearest indication that a decision of the courts of our State or of the United States is applicable to and invalidates those laws." *Id.* at 46. In his view, because the Maryland and federal courts had yet to clearly declare these types of laws to be unconstitutional, the clerk was required to continue to enforce Maryland's law. *Id.* at 46-48.[6] The Attorney General then gave the same answer a few years later, in response to a question from a member of the House of Delegates about the statute's constitutionality, despite acknowledging that "[i]n view of the recent decisions of the Supreme Court of the United States, of the federal courts, and the courts of this State, it might very well be found that this statute is in violation of the federal constitution." 51 *Opinions of the Attorney General* 150, 153 (1966).[7]

---

[6] The question of when the Office of the Attorney General should advise that an existing State law is unconstitutional in the absence of binding precedent directly on point is an admittedly difficult one that raises challenging questions about the separation of powers and the role of the Attorney General under our State's system. Indeed, this is a question that we have continued to grapple with over the years in other contexts. *See, e.g.*, 106 *Opinions of the Attorney General* 82, 91-92 (2021); 93 *Opinions of the Attorney General* 154, 160-61 (2008). The point of our opinion here today is not to decide the exact contours of that question but rather simply to disavow and to overrule the Office's prior opinions to the extent that they upheld racially discriminatory laws that are now clearly unconstitutional.

[7] The Attorney General also noted that there was no law prohibiting couples of different races, who had been married in another jurisdiction, from living together in Maryland. 51 *Opinions of the Attorney General*

Similarly, when the Office was asked shortly thereafter whether someone with one parent who was white and one parent who was of the "Malay" race was prohibited from marrying a white person, the Attorney General acknowledged that laws banning interracial marriages had been found unconstitutional in at least some other states and that the United States Supreme Court was currently considering the question in *Loving v. Virginia*. 52 *Opinions of the Attorney* General 35, 35-36 (1967). But the then-Attorney General nevertheless proceeded to consider the question of statutory interpretation that had been asked, noting that "[u]ntil such a Supreme Court decision clearly and unqualifiedly applicable to the Maryland statute or a final judgment of a Maryland court of appellate jurisdiction holds our law invalid, we must proceed without questioning the overall constitutional propriety" of the statute. *Id.* at 36.

Ultimately, the opinion concluded that a marriage between a white person and a person with one white parent and one "Malay" parent was permissible, but not on the ground that there was anything constitutionally problematic about the law. *Id.* at 38. Rather, the Attorney General concluded as a matter of statutory interpretation that the statute's prohibition applied only to persons who were of the "Malay" race, not persons of Malay *descent*. *Id.*

Obviously, these opinions are inconsistent with the Supreme Court's holding in *Loving v. Virginia* and with our current understanding of the Constitution. As the Supreme Court declared in its seminal decision in *Loving*, "[t]o deny th[e] fundamental freedom [to marry] on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law." 388 U.S. at 12.

Even though some of these prior opinions were framed as resolving questions of statutory interpretation and so did not expressly consider the constitutionality of the underlying laws, they nonetheless applied and interpreted the laws as if they were constitutional. Thus, these opinions upholding or applying these statutes are no longer good law and are overruled to the extent that

---

at 153. But the opinion stopped short of saying that such out-of-state marriages would be *recognized* as valid in Maryland. *Cf.* 95 *Opinions of the Attorney General* 3, 6 (2010) (concluding, prior to Maryland's legalization of same-sex marriage, that Maryland law would likely recognize such marriages if "contracted validly in another jurisdiction").

they upheld—either explicitly or implicitly—the discriminatory legal principle that the State was permitted to prohibit interracial marriages.[8]

### B.    School Segregation

Although Maryland had made sporadic attempts to establish a free public school system since the early nineteenth century, the State's 1864 Constitution made the first provision for a Statewide system of public schools.  Md. Const., Art. VIII, § 4 (1864); *see also* Maryland Manual, "State Department of Education: Origin," https://msa.maryland.gov/msa/mdmanual/13sdoe/html/sdoef.html (last visited Oct. 27, 2022).  That system was segregated from the start.  The General Assembly's 1865 implementing legislation required each school district to have "one or more schools . . . which shall be free to all white youth," 1865 Md. Laws, ch. 160, at 282, and separately provided for "schools for colored children" to be funded, if at all, exclusively by donations and by taxes paid by Black Marylanders, *id.* at 296-97.  This was the beginning of "a formal system of segregated schooling that continued for ninety years."  "State Department of Education: Origin," *supra*; *see also* 99 *Opinions of the Attorney General* 88, 91 (2014) (noting that Maryland retained *de jure* segregation in public education at the time of the Supreme Court's *Brown* decision).

The State also maintained a segregated system of higher education, again relying on the principle of "separate but equal" even where the separate facilities for Black students were demonstrably unequal.  *See, e.g.*, *Recommendations of the Maryland Commission on Higher Education*, at 24-25 (1947). Indeed, prior to 1920, Maryland offered no public higher education opportunities to Black students at all.  *See Coalition for Equity & Excellence in Md. Higher Educ. v. Maryland Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 513 (D. Md. 2013).  Over the following decades the State gradually developed what are now its historically Black colleges and universities (sometimes by acquiring formerly private institutions, as in the case of Morgan

---

[8] To be clear, we do not necessarily mean to cast doubt on the principles of statutory interpretation that these opinions employed (though, in at least some cases, the Office's statutory interpretation too may have been tainted by discriminatory reasoning).  As noted above, *supra* note 1, it is not within the scope of our opinion here today to consider whether the Office properly interpreted the laws then in effect as written.  The point is instead that the opinions are no longer good law to the extent that they explicitly or implicitly upheld the constitutionality of prohibiting interracial marriage.

State University).  *See id.* at 513-15.  The Maryland courts also ordered the integration of the University of Maryland School of Law in 1936, because the State had no law school at all for Black students.  *See University of Md. v. Murray*, 169 Md. 478, 487-88 (1936).  But the system as a whole remained segregated.

In 1954, of course, the U.S. Supreme Court declared the segregation of public schools to be unconstitutional.  *Brown v. Board of Educ.*, 347 U.S. 483 (1954).  The Court held that "the doctrine of 'separate but equal' has no place" in "the field of public education" and declared that "[s]eparate educational facilities are inherently unequal." *Id.* at 495.  The Attorney General subsequently advised the State Superintendent of Schools, first informally and then in an official opinion, that *Brown* was "crystal clear" and that, under its holding, "all constitutional and legislative acts of Maryland requiring segregation in the public schools in the State of Maryland are unconstitutional, and hence must be treated as nullities."  40 *Opinions of the Attorney General* 175, 175-77 (1955).  However, as we will discuss, the Office was more resistant to the idea of extending *Brown* to require desegregation in other areas.

Although the cases consolidated in *Brown* arose from elementary and secondary schools, it was quickly recognized that *Brown* required desegregation in higher education as well.  Mary Ann Connell, *Race and Higher Education: The Tortuous Journey Toward Desegregation*, 36 J. Coll. & Univ. L. 945, 951-52 (2010).  After *Brown*, then, the Supreme Court and lower courts had little difficulty confirming that public colleges, universities, and graduate schools must desegregate.  *See, e.g.*, *Florida ex rel. Hawkins v. Board of Control*, 350 U.S. 413, 414 (1956) (per curiam) (involving the University of Florida College of Law); *Meredith v. Fair*, 305 F.2d 343, 344, 361 (5th Cir. 1962) (involving the University of Mississippi).

As far as we have been able to tell, the Office of the Maryland Attorney General did not issue any opinions expressly considering the constitutionality of school-segregation laws prior to the Supreme Court's decisions overturning such laws.[9]  Instead, the

---

[9] The Office of the Attorney General did recognize, before *Brown*, that when a Black student was admitted to a normally all-white institution, the Black student had to be given access to the institution's facilities, such as dormitories, on the same terms as white students.  36 *Opinions of the Attorney General* 334, 334-35 (1951).  But the opinion

Office received questions about how to interpret various laws that supported the State's regime of segregated schools, and our predecessors generally interpreted or otherwise cited those laws without raising any questions about their constitutionality.[10] For example, in 1937, the Office considered whether the University of Maryland could remove two Black students who had been admitted to its law school on the basis of a new statute that afforded scholarship funds for Black students to attend out-of-state higher education institutions when they were otherwise qualified for admission to Maryland programs (like law school) that were not offered at the State's colleges for Black students. 22 *Opinions of the Attorney General* 827, 827-28 (1937). Although the Office concluded that the law did not apply retroactively to allow the removal of those two students, *id.* at 828, the opinion did not question the legality of the new legislative scheme, even though a clear purpose of that scheme was to try to provide a legal argument justifying the re-segregation of the University of Maryland's law school on the grounds that Black students had now been given scholarships to attend a supposedly "separate but equal" law school outside the State.[11]

---

did not question or consider the constitutionality of a separate-but-equal regime more generally.

[10] *See* 6 *Opinions of the Attorney General* 146, 146-48 (1921) (interpreting the statutory funding requirements for a "central colored industrial school" in Charles County without questioning the creation of a separate school for Black students); 19 *Opinions of the Attorney General* 527, 527-28 (1934) (analyzing whether a scholarship program for Black students was limited to use at "Princess Anne Academy"—which was a State higher education institution solely for Black students—without questioning the legality of having a segregated college); 21 *Opinions of the Attorney General* 807, 807-08 (1936) (deciding which entity had the legal duty to fund a "training school" for "colored girls" without considering the legality of segregation of such schools); *see also* 5 *Opinions of the Attorney General* 136, 137-38 (1920); 5 *Opinions of the Attorney General* 139, 140 (1920); 6 *Opinions of the Attorney General* 556, 556-57 (1921); 8 *Opinions of the Attorney General* 113, 114 (1923); 10 *Opinions of the Attorney General* 105, 105 (1925); 12 *Opinions of the Attorney General* 85, 86 (1927); 19 *Opinions of the Attorney General* 343, 344-45 (1934); 24 *Opinions of the Attorney General* 577, 577-78 (1939); 27 *Opinions of the Attorney General* 79, 79 (1942).

[11] The next year, the U.S. Supreme Court found that such a scholarship scheme in a different state did not satisfy that state's constitutional obligations even under the pre-*Brown* standard of "separate but equal." *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 348-50 (1938).

In fact, in one instance, our predecessors even suggested continuing approval of the doctrine of "separate but equal," though that was not the focus of that opinion.  More specifically, when considering the same scholarship program that was at issue in the 1937 opinion, the then-Attorney General acknowledged that "the State [was] constitutionally required to extend to its citizens, white and colored alike, substantially equal treatment in the facilities it provides from the public funds" but went on to say that "[t]his equality does not require that the privilege be provided members of the two races in the same place."  27 *Opinions of the Attorney General* 278, 278 (1942).

Although these pre-*Brown* opinions generally did not consider the constitutionality of school-segregation regimes, they also did not question the legality of such regimes.  We thus overturn these prior opinions to the extent that, by interpreting and applying Maryland's racially discriminatory laws, they implicitly upheld the principle that segregation of public schools was constitutionally permissible.[12]

After the Supreme Court's decision in *Brown*, the Office of the Attorney General was asked on multiple occasions to address the constitutionality of some of the State's remaining school-segregation laws.  The Office's opinions responding to those questions, however, were not always consistent with the spirit of the *Brown* decision (or with our current understanding of the Constitution).

In a 1956 opinion, for instance, the then-Attorney General considered whether *Brown* and related cases also invalidated the Maryland statutes that created segregated "training schools."  41 *Opinions of the Attorney General* 120, 120 (1956).  The training schools in question had been created as "places to separate erring minors from the corrupting influence of improper circumstances" and, given that the minors resided there by order of the Maryland courts, the training schools functioned in part as schools and in part as correctional institutions.  *Id.* at 127.  The Attorney General concluded that the "training schools" were different enough from the public schools that had been at issue in *Brown* to leave some question about whether the Maryland laws providing for

---

[12] Again, we express no view on whether the prior opinions correctly interpreted the statutes in question as they existed at the time and no view about the other aspects of the opinions that did not involve the implicit or explicit approval of the legal principles underlying the State's segregation regime.

segregated training schools had been invalidated by Supreme Court's decision. *Id.* More specifically, in the then-Attorney General's view, the fact that the training schools served in part as correctional institutions meant the Supreme Court's rationale in *Brown*, which he claimed was based only on concerns about *educational* equality, did not necessarily apply. *Id.* at 128-29.[13] Even when given an opportunity three years later to change his mind, the then-Attorney General reiterated his view, finding again that the segregation of the State's training schools had not yet been rendered clearly unconstitutional by Supreme Court precedent. 44 *Opinions of the Attorney General* 123, 125 (1959).

Eventually, Maryland's highest court decided the question and held, unsurprisingly, that the segregation of Maryland's training schools clearly violated the Constitution under *Brown*. *State Bd. of Pub. Welfare v. Myers*, 224 Md. 246, 253-55 (1961). The Court explained that the U.S. Supreme Court in *Brown* had "flatly stated that in the field of public education the doctrine of 'separate but equal' has no place" and had "repudiated" the "basic rationale" of the "separate but equal" doctrine from *Plessy v. Ferguson*. *Id.* at 253. Thus, the Maryland courts found, "[t]here can be no doubt the principle extends to public education at all levels," including the "educational programs offered in the training schools." *Id.* at 253-54. Following the decision in *Myers*, the Attorney General issued an opinion which acknowledged that the segregation of training schools was unconstitutional. 46 O*pinions of the Attorney General* 51, 51 (1961). Although the two prior opinions upholding segregation in training schools were effectively overturned by that 1961 opinion, we now formally overturn them as well.

### III
### Conclusion

The U.S. Supreme Court and the Maryland courts have made clear that laws prohibiting interracial marriage and providing for the racial segregation of public schools are illegal and contrary to

---

[13] In drawing that comparison, the then-Attorney General relied on the disturbing argument that desegregation of the training schools "could have the effect of enforcing *social* as well as *educational* association among the inmates for twenty-four hours a day." 41 *Opinions of the Attorney General* at 129 (emphasis in original). The undeniably racist notion appeared to be that requiring white children to live with Black children (and vice versa) could somehow lead to societal harms that requiring them to go to school together would not.

the values of our federal and State constitutions. Thus, the prior opinions of the Attorney General involving such laws are no longer good law to the extent that they explicitly or implicitly upheld either these discriminatory laws or the discriminatory legal principles used to justify such laws. Although, as a practical matter, those aspects of the opinions were long ago rendered unenforceable by changes in the law, we recognize that the opinions continue to serve as a reminder of the history of racial injustice perpetuated through the legal institutions of our State government. We thus formally overrule the portions of those opinions that upheld or relied on the erroneous view that the State could prohibit interracial marriages and impose the segregation of public facilities under the doctrine of "separate but equal." Renouncing these unfortunate opinions cannot change the past, but we hope that it will serve to reinforce our Office's current commitment to equality under the law.

Brian E. Frosh
Attorney General of Maryland

Thomas S. Chapman
Assistant Attorney General

Patrick B. Hughes
Chief Counsel,
   Opinions and Advice

* Whitney Grimm and Sharon Kimemia, former interns for the Office of the Attorney General, contributed significantly to the preparation of this opinion.