## WILLIAM F. COCHRAN, JR., *vs.* EDWARD D. PRESTON, INSPECTOR OF BUILDINGS OF BALTIMORE CITY, ET AL.

*Constitutional Law—Validity of Statute Regulating Height of Buildings to be Erected in a Designated Locality.*

The right to make reasonable regulations concerning the height of buildings in a city is within the police power of the State.

The Act of 1904, ch. 42, prohibits the erection of any building, except churches, to exceed in height seventy feet above the surface of the street at a certain point within a designated portion of Baltimore City. The Washington Monument stands in the centre of this territory, and it comprises the Peabody Library and Art Gallery, several statues in open squares and private residences containing valuable works of art. *Held*, that the object of the Act is not merely to preserve the architectural beauty of that locality but also to avoid the increased danger which the great fire that devastated a large part of Baltimore City shortly before the passage of the Act showed to arise from tall buildings in the event of a general conflagration, and that since the object of the Act is to promote the public welfare, and the means prescribed are appropriate thereto, the statute is valid and is not a denial of the equal protection of the law.

*Held*, further, that it is no objection to the Act that the owners of land below the point designated for the measurement of the height may build higher structures than the owners of land above them, the ground at that point being hilly, since the danger from fire in the one case is greater than in the other; and it is also no objection to the Act that churches are exempt from its operation since there is not the same necessity for regulating the height of churches as of other buildings.

*Decided June 24th, 1908.*

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and WORTHINGTON, JJ.

*W. Stuart Symington, Jr.,* (with whom was *Osborne I. Yellott* on the brief), for the appellant.

The appellant contends that ch. 42 of the Acts of 1904 is unconstitutional, null and void, because in conflict with the Fourteenth Amendment to the Federal Constitution, with Article 23 of the Declaration of Rights of the State of Maryland, and with sec. 40 of Art. 3 of the Constitution of Maryland.

The Act is unconstitutional because (I) it takes private property without due process of law, and because (II) it denies the equal protection of the laws.

I. Private property can legally be taken for public use in only two ways: (1) by the exercise of the power of eminent domain, and (2) by the exercise of the police power, but

1. The Act is not a valid exercise of the power of eminent domain, because

a. Whether the purpose is a public one is a judicial question, and the Courts have decided that a purely æsthetic purpose is not such a public purpose as will justify the taking of private property, even after compensation; and

b. No compensation is provided for.

2. The Act is not a valid exercise of the police power, even if we could assume that the legislative intent was to promote the safety of the public, and not to preserve the beauty of Mt. Vernon Place, because

a. The Act does not tend to promote the safety of the public, and it is not permissible to use the police power as a cloak to hide its purely æsthetic purpose; and

b. Purely æsthetic purposes do not justify the exercise of the police power.

II. The Act denies the equal protection of the laws, because

1. It discriminates in favor of churches;

2. It does not apply to other areas of similar character to. the one arbitrarily prescribed;

3. It does not apply equally even to all the property of like kind within the prescribed area. ·

In *Bostock* v. *Sams*, 95 Md. 400, this Court declared invalid a municipal ordinance having for its object conformity in the general appearance of neighboring buildings, although the opinion distinctly recognized the fact that the municipality was possessed of the police power of the State, and was authorized in terms to pass such ordinances "as it may deem expedient in maintaining the peace, good government, health and welfare of the city." The ordinance, say the Court, "contains no suggestion that it was intended to provide for the public safety, nor to safeguard the health or morals of the community, nor to preserve public order, nor in any way to be promotive of any object which calls for the exercise of the police power."

The legislative intent in passing this Act was either to promote the safety of the public or to preserve the beauty of Mt. Vernon Place. Assuming that the intent was to promote the safety of the public, the Act is invalid, under all the authorities, because it does not reasonably tend to that end. That it is not reasonably necessary to the safety of the public is also evident from the fact that the Baltimore City Code (Art. 3, sec. 96) permits the erection of buildings 175 feet high. *Tiedeman, Limitations upon the Police Power*, 10, 12; *Lewis, Eminent Domain*, sec. 156; *Freund, Constitutional Rights and Public Policy*, sec. 511, 514; *Dillon, Municipal Corporations*, 4 ed., sec. 141; *Mayor and City Council of Baltimore* v. *Radecke*, 49 Md. 217; *California Reduction Co.* v. *Sanitary Reduction Works*, 126 Fed. Rep. 29; *In re Jacobs*, 98 N. Y. 98; *People* v. *Jackson, etc.*, 9 Mich. 285; *Colon* v. *Lisk*, 153 N. Y. 188; *Austin* v. *Murray*, 16 Pick. 121; *Grand Rapids* v. *Powers*, 89 Mich. 94; *In re Cheesebrough*, 78 N. Y. 232, 237; *Young's Case*, 101 Va. 853; *Wright* v. *Hart*, 182 N. Y. 330; *Tilford* v. *Belknap*, 103 S. W. 289; 11 L. R. A. (N. S.) 708; *State* v.

*Redmond,* 114 N. W. 137; *People* v. *Steele,* 83 N. E. 236, 240; *City of St. Louis* v. *Hill,* 116 Mo. 527; *Bank* v. *Sarlls,* 13 L. R. A. 481; *Crawford* v. *City of Topeka et al.,* 20 L. R. A. 692.

But clearly the intent of the Legislature was not to promote the safety of the public, but to preserve the beauty of Mt. Vernon Place. This appears from the Act itself and from external evidence as well.

The exception of churches from the provisions of the Act can only be accounted for on the theory that they were regarded as architectually ornamental. The fact that the building restriction is limited to an area of which the Washington Monument is the center is proof of the æsthetic motive behind the Act, and no other reasonable explanation can be given for the selection of the base line of the Monument instead of the street level at each building as the point from which to reckon the allowed height. Again, if the Legislature had in mind, in passing the Act, the safety of the public, why should the Severn Apartment House and the Stafford Hotel, both standing, as they do, far more than 70 feet above the base line of the Monument, be allowed in the prescribed area? Why are no similar building restrictions to be found elsewhere in the City of Baltimore?

The question is, then, squarely presented:

*Will the police power justify a taking of private property, without compensation, to promote a purely æsthetic purpose?*

All the authorities agree that the police power is based on the maxim, "*sic utere tuo, ut alienum non laedas;*" its character is essentially negative; it restrains the noxious; it cannot be used to raise in the public an easement at the expense of the individual; its function is to "protect the health and provide for the safety and good order of society." *Deems* v. *Mayor and City Council,* 80 Md. 164.

But *Tiedeman (State and Federal Control of Persons and Property,* 2, p. 755) answers the question categorically: "Regulations, which are designed only to enforce upon the people the legislative conception of artistic beauty and symmetry, will

not be sustained, however much such regulations may be needed for the artistic education of the people." *Tiedeman, Limitations upon the Police Power*, p. 4; *Freund, Constitutional Rights and Public Policy*, secs. 180, 181, 514; *Commonwealth v. Boston Advertising Co.*, 188 Mass. 348 (affirmed in *Belmont v. Brick Co.*, 190 Mass. 442); *Parker v. Commonwealth*, 178 Mass. 476; *Welsh v. Swasey*, 193 Mass. 365; *Attorney General v. Williams*, 174 Mass. 476; *People v. Green*, 83 N. Y. Supp. 460; *St. Louis v. Dorr*, 145 Mo. 466 (see especially the dissenting opinion); *People v. Green*, 85 N. Y. App. Div. 400; *People v. Huyland et al.*, 86 N. Y. App. Div. 612 (unreported case).

In the case of *Attorney General v. Williams*, 174 Mass. 476, known as the Copley Square case, and much relied on by the appellee, the suggestion is made by the Court that a statute similar to our Act of 1904 might have been passed under the police power. But in this connection it should be noted: 1. That the statute was in fact passed, not under the police power, but under the power of eminent domain. This fact is made clear elsewhere in the opinion and is also brought out in *Williams v. Parker*, 188 U. S. 491; *Attorney General v. Williams*, 178 Mass. 330, a second appeal of the Copley Square case; *Commonwealth v. Boston Advertising Co.*, 188 Mass. 348, and *Welsh v. Swasey*, 193 Mass. 365. (Opinion by the Judge who delivered the opinion in the Copley Square case).

2. The Supreme Court of the United States declined to consider this suggestion on appeal. *Williams v. Parker*, 188 U. S. 491.

3. The doctrine of the suggestion has been expressly disaffirmed in the Massachusetts cases cited above.

Moreover, this Copley Square case is authority for the proposition that the statute there in question, which was similar, as already stated, to our Act of 1904, "adds to the public park rights in light and air and in the view over adjacent land above the line to which buildings may be erected. These rights are in the nature of an *easement* created by the statute and annexed to the park. Ample provision is made for com-

pensation to the *servient* estate." This proposition seems to us to be correct, and if it is, our Act is unconstitutional because creating an easement in the public above the line to which buildings may be erected, without providing for compensation to the servient estate.

The Act denies the equal protection of the laws guaranteed by the Fourteenth Amendment to the Federal Constitution, in that it (1) discriminates in favor of churches; (2) does not apply to like districts, with like conditions, but prescribes an arbitrary area without reasonable ground on which it may be based, and (3) does not apply equally even to all the property of the same kind within said arbitrarily prescribed area. *Connolly* v. *Union Sewer Pipe Company*, 184 U. S. 540; *Cotting* v. *Kansas City Stock Yards Co.*, 183 U. S. 79; *Jamesville* v. *Carpenter*, 77 Wis. 279; 15 L. R. A. 830; *State* v. *Haun*, 61 Kan. 146; *Bank* v. *Ozan Lumber Co.*, 127 Fed. Rep. 206; *Railway Co.* v. *Ellis*, 165 U. S. 150. Cases involving the question of classification for purposes of taxation have no application. *Connolly* v. *Sewer Pipe Co.*, *supra*.

*Sylvan Hayes Lauchheimer* (with whom was *W. Cabell Bruce* on the brief), for the appellees.

In order to be valid, an Act of Assembly need not apply to all portions of a city, or to all individuals. *Garrett* v. *Janes*, 65 Md. 260, 267; *State* v. *Broadbelt*, 89 Md. 565, 580, 581, 582; *Watertown* v. *Mayo*, 109 Mass. 319; *Walch* v. *Swasey*, 193 Mass. 364.

The right of the State in the exercise of the police power to limit the height of buildings can no longer be questioned. *Lewis on Eminent Domain*, sec. 156; *Tiedeman on State and Federal Control of Persons and Property*, 754; *Welch* v. *Swasey*, 193 Mass. 364, 373, 374; *Attorney General* v. *Williams*, 174 Mass. 477, 478; *Watertown* v. *Mayo*, 109 Mass. 319; *People* v. *D'Oench*, 111 N. Y. 361.

Cases similar to the one at bar, which have been decided by the Courts of last resort, have been extremely few. They are chiefly from the Court of Appeals of Massachusetts, a

Court of deservedly high reputation for the accuracy, cogency and learning of its opinions. The cases decided by this Court are directly in point, and uphold the contention of the city that chapter 42 of the Acts of 1904 is a valid exercise of the police power of the State of Maryland, and that until repealed is binding on the appellant, whose application for a permit was not made to the appellees until after said Act had become a law.

"Chapter 454 of the laws of 1885 of New York provided that the height of all dwelling houses and of all houses used or intended to be used as dwellings for more than one family thereafter to be erected in the city of New York shall not exceed eighty feet in streets and avenues exceeding sixty feet in width.

"We have no doubt of the competency of the Legislature, in the exercise of the police power, under the Constitution to pass such an Act." *People* v. *D'Oench*, 111 N. Y. 361.

WORTHINGTON, J., delivered the opinion of the Court.

The only question involved in this appeal is whether or not the Act of 1904, ch. 42, is a valid exercise of legislative power.

By this Act it is provided, "that from and after the date of the passage of this Act, no building, except churches, shall be erected or altered in the city of Baltimore on the territory bounded by the south side of Madison street, the west side of St. Paul street, the north side of Center street and the east side of Cathedral street, to exceed in height a point seventy feet above the surface of the street at the base line of Washington Monument."

The Act was approved March 15th, 1904.

The ordinances of Baltimore require all persons who desire to build, alter or repair any structure within the limits of the city, or who desire to put an additional story upon any building therein, to obtain a permit from the Inspector of Buildings, and also from the Appeal Tax Court of that city.

The appellant is the owner of a large apartment house located on the northwest corner of Mt. Vernon Place and

Washington Place, within the territory to which the prohibition of the statute applies, and desiring to put an additional story thereon to be used as quarters for employees, he applied to the appellees for a permit to make the desired alteration.

In his application for such a permit the applicant stated that the house is at present seventy feet high, and that the proposed addition would be but eight feet in height, and set back on the roof at a uniform distance of twenty feet from Mt. Vernon Place, and a like uniform distance from Washington Place, and that it would not be possible to see any part of the addition from either of these places.. That the total cost of the building and ground in the first place, was about $450,000, and that as the building now stands, it is impossible to derive from the same a sufficient revenue to yield a fair profit on the investment therein, but that the proposed addition would enable the owner to derive a fair return for the whole outlay.

The appellees refused the permit on the ground that the additional story proposed would raise the building to a height greater than seventy feet above the base line of Washington Monument, contrary to the provisions of the Act of Assembly above mentioned.

A *mandamus* was then applied for and denied by the Court for the same reason assigned by the appellees in the first instance.

It is elementary that the word "land," in its legal signification, has an indefinite extent upwards as well as downwards and, therefore, if it were possible for man to live in a state of nature, unconnected with other individuals, the proprietor of land would own not only the face of the earth within the boundaries of his proprietorship, but also everything under it and over it.   An imaginary person living in such a state of nature, would be at liberty to use his land as he pleased; to build on it to any height, and to dig into it to any depth, without restraint.   But as man was formed for society and is incapable of living alone, organized society is essential to his well being and happiness, and every person who enters society must give up a part of his so called natural rights and liberties for the benefit of the commuity.   1 *Black. Com.*, p. 125.

"The very existence of government presupposes the right of the sovereign power to prescribe regulations demanded by the general welfare for the common protection of all. The principle inheres in the very nature of the social compact. The protection of private property is one of the chief purposes of government, but no one holds his property by such an absolute tenure as to be freed from the power of the Legislature to impose restraints and burdens required by the public good, or proper and necessary to secure the equal rights of all." *Parker and Worthington Public Health and Safety*, sec. 14.

The power to prescribe regulations demanded by the general welfare for the common protection of all, is known as the police power of the State, and is inherent in every sovereignty. *Prentice on Police Power*, p. 6; *Comm.* v. *Alger*, 7 Cush. 53; *Munn* v. *Illinois*, 94 U. S. 113.

Among the police powers of the State the right to regulate the height of buildings in a city is one that cannot be questioned. *Lewis on Eminent Domain*, sec. 156; *Tiedeman on State and Federal Control of Persons and Property*, page 754; *Welsh* v. *Swasey*, 193 Mass. 364.

Yet such regulations must be reasonable in their character and adapted to accomplish the purpose for which they are designed. *People* v. *D'Oench*, 111 N. Y. 359; *Watertown* v. *Mayo*, 109 Mass. 319; *Atty. Gen.* v. *Williams*, 174 Mass. 477.

As the purpose of the statute under consideration does not appear on its face, such purpose is open to inquiry, and the appellant contends that its purpose was and is to preserve the beauty and architectural symmetry of the environment of Washington Monument, and that in the exercise of the police power property rights cannot be impaired for purely æsthetical purposes.

To sustain the legal proposition, he quotes from *Freund, Constitutional Rights and Public Policy* (1904) sec. 181, as follows: "If the purposes were purely æsthetic, the impairment of property rights, even upon the payment of compensation, would not pass unchallenged," and also from *Tiedeman, State and Federal Control of Persons and Property*, 11, p. 755, as

follows: "Regulations which are designed only to enforce upon the people the legislative conception of artistic beauty and symmetry, will not be sustained, however much such regulations may be needed for the artistic education of the people."

Such is undoubtedly the weight of authority, though it may be that in the development of a higher civilization, the culture and refinement of the people has reached the point where the educational value of the Fine Arts, as expressed and embodied in architectural symmetry and harmony, is so well recognized as to give sanction, under some circumstances, to the exercise of this power even for such purposes.

In *Welsh* v. *Swasey, supra,* it is said that, "if the primary and substantial purpose of the legislation is such as justifies the act, considerations of taste and beauty may enter in as auxiliary." And our predecessors have said in speaking of an ordinance of Baltimore City passed in pursuance of the Act of 1833, ch. 180, and regulating the distance that any portico, steps or other ornamental structure on Mt. Vernon Place might extend from the building line into the street, that the object was, "in furtherance of the purpose to render these places or squares attractive, to give more freedom to the exercise of private taste for adornment in their vicinity. In a city noted for its monuments, municipal legislation peculiar to their neighborhood would seem indispensable." *Garrett* v. *Janes,* 65 Md. 260.

We do not assent however, to the proposition that the statute under consideration was passed for purely ornamental purposes.

We find a more substantial reason for its enactment in the suggestion of the counsel for the appellees, that its purpose was to protect the handsome buildings and their contents, located in that vicinity, and also the works of art clustered there, from the ravages of fire.

It must be remembered that in the center of the prescribed territory to which the statute applied, stands the lofty and beautiful monument to the illustrious Washington; on one corner of the Mt. Vernon Place and Washington Place is the

handsome Mt. Vernon Methodist Episcopal Church, on an-
other is the Peabody Institute, a stately marble building in
which are kept for public use many rare and valuable books
and works of art, to replace which would be well nigh impos-
sible; in the same neighborhood are numerous handsome
residences of private citizens, containing valuable works of art
and of literature.

In Mt. Vernon and Washington Places are found statues to
several eminent Marylanders; Severn Teackle Wallis, Roger
B. Taney, and General John Eager Howard, and also a num-
ber of beautiful figures known as the Barye bronzes, so that
the environment of the locality in question is in several respects,
unique, and well worthy of preservation in its entirety.

During the session of the Legislature at which the statute
under consideration was passed, a great fire visited Baltimore
and destroyed a large part of the business section of the city.
Extracts from an account of the fire will demonstrate some of the
dangers to be apprehended from this devouring element. The
account says: "The fire spread to the north and east, rapidly
devouring block after block of buildings. Landmark after land-
mark went down. Nothing but burnt clay—bricks and cement—
could stand against a conflagration which developed 2,500 de-
grees of heat, and was carrying itself along by its own volume,
against which no water supply, no human effort could be
effective. The lofty skyscrapers on Charles, St. Paul, Calvert
and Baltimore streets, burned like great torches up to the sky.
Granite and marble cracked and spalled off. The marble
work of the new Custom House then in course of construc-
tion was badly damaged wherever exposed to the heat, as
was also the St. Paul street front of the new Court House.
Shortly after midnight the American newspaper office was en-
veloped in flames which quickly spread across to the Sun Iron
Building involving all in common ruin. Devastation was carried
down Calvert street, down South street and Holliday street and
Gay street, wiping out hotels, newspaper offices, bank buildings,
warehouses and nearly everything in the way clear to the
water front of the inner harbor   Among the buildings de-

stroyed were many so called fire proof structures.   After the
fire these lofty buildings stood amidst the ruins of lesser build-
ings, like gaunt skeletons, burned out interiorly but still
structurally fire proof, with from 40 to 60 per cent salvage
credited to their construction."

Great impetus is given to such a fire by very tall buildings.
They serve as so many large funnels furnishing draft for the
flames, thereby intensifying the heat, and outreaching the
efforts of the firemen.

Already some very tall buildings have been erected in this
locality; the "Hotel Stafford," being one hundred and thirty-
two feet high, and the apartment house known as "The Sev-
ern," being one hundred and fifteen feet above the pave-
ment at the base line of Washington Monument.   It was to
prevent the multiplication of such buildings in this neighbor-
hood, and the increased danger from fire attendant thereon,
that this statute was no doubt passed.

We consider such an object entirely legitimate, und the
statute valid as far as its purpose is concerned.

The appellant, contends however, that as the prescribed
territory is hilly and the base line of Washington Monument
practically the highest point within its limits, that persons
owning property on lower ground have an advantage over
those whose property is located on the higher ground, because
the former may build houses to a greater height than the
latter, and that therefore the statute denies the equal protec-
tion of the laws contrary to the XIV Amendment to the Con-
stitution of the United States.

While we recognize the force of this contention, we think,
when it is remembered that the primary object of the law is
protection from fire, it is met by the consideration that very
tall buildings on the highest part of the ground would be
more difficult to deal with in case of fire than such buildings
lower down.

By operating from the higher portions of ground, water
might be thrown on tall buildings further down the hill, and
reach the top, while the tops of buildings of the same height

on the higher ground would be wholly out of the reach of the. fire apparatus.

"In virtue of its right and duty to provide for the public welfare, the legislative branch of government possesses a large discretion as to the manner in which it shall be exercised." *Parker and Worthington, Public Health and Safety*, sec. 4.

If the object of the statute is to promote the public welfare, and there is a substantial relation between the object aimed at and the means devised for attaining that object, every intendment will be in favor of the entire validity of such statute. *Ibid; Adler* v. *Whitbeck*, 44 Ohio St. 539-562; *Minnesota* v. *Barber*, 136 U. S. 313.

The presumption in favor of the validity of the statute should prevail, unless the lack of constitutional authority is clearly demonstrated. *U. S.* v. *Harris*, 106 U. S. 629.

It was for the Legislature to determine the manner in which the purpose aimed at was to be accomplished, and we are not prepared to say that the method adopted does not bear a substantial relation to the object aimed at, or that it denies the equal protection of the laws, as that term is understood and construed. *Easton* v. *Covey*, 74 Md. 262; *Exparte Fisk*, 72 Cal. 125; *Hine* v. *New Haven*, 40 Conn. 478; *People* v. *D'Oench*, 111 N. Y. 361.

In the last mentioned case the Court held that a statute regulating the height of all houses used as dwellings, did not include stores, factories, warehouses, buildings used for offices, or hotels and that it was a valid exercise of the police powers, although because private residences were seldom above the prescribed height, it in effect applied only to tenement and apartment houses.

The last mentioned case is also authority for upholding the present statute, although churches are, in terms, exempted from its operation.

There is not the same reason for regulating the height of churches as of some other buildings. The former frequently have spires for ornamental purposes reaching a much greater height than seventy feet, but they do not present the same

danger from fire to the surrounding buildings as many other structures do, chiefly because they are not likely to become very numerous in any one locality.

After a careful consideration of the case in all its different aspects, we think the order of the lower Court dismissing the application for a writ of *mandamus* was right, and the same will therefore be affirmed.

*Order affirmed with costs.*