# R. B. CONSTRUCTION COMPANY *v.* HOWARD W. JACKSON, Mayor.

*Zoning Ordinance—Building Regulations—Constitutionality.*

A limitation cannot be placed by a city ordinance upon a property owner's rights as to the extent of his lot which may be built upon, except for the protection or promotion of some public interest which justifies the exercise of the police power.
p. 674

In regard to any purpose within the proper scope of the police power, Baltimore City has under its charter the full measure of the authority which the State itself could exert.     p. 674

An ordinance restricting the extent of the buildings on any particular lot may be sustained even though its necessity as a police measure is not clearly demonstrated, provided it has a reasonable tendency to serve a legitimate purpose of the police power.     p. 674

The provision of the Baltimore City Zoning Ordinance, requiring that, in certain outlying sections, a side yard ten feet wide be reserved on each lot, is a valid exercise of the city's police power.                                pp. 674-678

That the Baltimore City Zoning Ordinance authorizes the board of zoning appeals to vary or modify any of its regulations, where there are practical difficulties or unnecessary hardships in the way of its strict enforcement, the expressed purpose being, however, that the spirit of the ordinance be preserved, does not involve an unconstitutional delegation of authority to the board, as regards a requirement of the ordinance that a side yard ten feet wide be reserved on each lot in certain outlying portions of the city, the discretion vested in the board being limited, and manifestly intended to be exercised for the owner's benefit.
pp. 678, 679

*Decided March 23rd, 1927.*

Appeal from the Baltimore City Court (DAWKINS, J.).

Petition for mandamus by the R. B. Construction Company against Howard W. Jackson, Mayor of Baltimore City, and Charles H. Osborne, Inspector of Buildings for Baltimore City. From a judgment for defendants, petitioner appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William Pinkney White, Jr.,* and *Isaac Lobe Straus,* with whom was *Jesse Ashman* on the brief, for the appellant.

*Charles C. Wallace, City Solicitor,* and *John Henry Lewin, Assistant City Solicitor,* for the appellees.

URNER, J., delivered the opinion of the Court.

The appellant is the owner of a lot of ground fronting about three hundred and twenty-four feet on Granada Avenue in the City of Baltimore, and desires to erect on the lot sixteen two-story dwelling houses in a continuous row. The proposed dwellings would each have a width of approximately twenty feet, would stand forty-five feet back of the street line, and would have yards in the rear about sixty feet in depth. Permission to erect the row of buildings was refused by the inspector of buildings of the city because the lot is located in a district within which the erection of solid rows of houses is prohibited by certain provisions of the city's Zoning Ordinance. A petition was then filed in the Baltimore City Court by the appellant for a mandamus to compel the issuance, by the mayor and inspector of buildings, of a permit for the construction of the projected row of dwellings. The answer to the petition averred that the lot in question is included in an E area district designated in the Zoning Ordinance, which contains the following provision: "In an 'E' area district there shall be reserved on each lot at least one side yard not less than ten feet wide, except in cases where, because of the size and/or shape of any lot or tract, such requirement cannot be complied with or would render such lot or tract unfit for use, and in such cases the board of zoning appeals may

reduce the requirement as it may deem reasonable and proper."

As explained in the answer, it was because the appellant's plans did not provide for the side yards required by the provision just quoted that the permit applied for was refused. The effect of such a provision, as applicable to the prescribed zone areas, is said by the answer to be promotive of the public safety, health, and morals, by preventing an increase in the density of population and thereby reducing fire and traffic hazards, avoiding undue burden upon sewerage, transportation, and other public facilities, and improving, with reference to light and air, and in other respects, the living conditions of the people. A demurrer to the answer was overruled and, the petitioner having declined to plead further, a judgment was entered for the defendants. The appeal is from that judgment.

The Zoning Ordinance of Baltimore was enacted, as it recites, for the purpose of establishing "a general zone plan which will insure a fair and adequate division of light and air among buildings, protect the residence districts, prevent congestion, lessen the fire hazard, increase industrial and commercial efficiency, conserve property values, and direct the building of the city in accordance with a comprehensive plan for the use and development of all parts of the city." Three systems of zoning were created by the ordinance. One was made the basis of regulations as to the uses of property. Another was designed to serve the purposes of provisions as to the height of buildings thereafter erected. The third, which is the one involved in this proceeding, is intended to be applied in the regulation of future building construction with respect to the lot area to be occupied. There are six series of area districts, designated as A, B, C, D, E, and F, into which the ordinance divides the territory within the city's boundaries. The proportion of the individual lot area allowed to be covered by subsequently erected buildings ranges from seventy per cent. for interior lots and eighty-five per cent. for corner lots in A area districts, to twenty-five or

thirty per cent. in F areas. In the E areas thirty or forty per cent. of a lot may be covered by a building. No side yards are prescribed except in the E and F areas, which are located in the outlying sections of the city, as shown by the map used at the argument. A large part of the undeveloped land within the city limits appears to be included in the E area districts. The map shows that the E areas form a zone which completely encircles the city except as to a part of its water front. One of the most important purposes of the Zoning Ordinance is to regulate building expansion of the city over the open area available for its development. The question is whether, in aid of such a purpose, the city could validly impose the building restriction of which the appellant complains.

It is clear that such a limitation cannot be placed upon the exercise of the property owner's rights except for the protection or promotion of some public interest which justifies the exercise of the police power. In regard to any purpose within the proper scope of that power, the City of Baltimore has been invested with the full measure of the authority which the State itself could exert. Charter of Baltimore, art. 1, sec. 18. *Rossberg v. State,* 111 Md. 394; *Osborne v. Grauel,* 136 Md. 88. It is not essential to a decision sustaining the ordinance, as to its area provisions, that its necessity as a police measure shall be clearly demonstrated. Unless it can properly be held to have no reasonable tendency to serve any legitimate purpose of the police power, we cannot rightfully declare it void. *Ches. & Pot. Tel. Co. v. Board of Forestry,* 125 Md. 666; *Cochran v. Preston,* 108 Md. 220; *State v. Hyman,* 98 Md. 596.

In this case there is a conflict between a private property right and the desire of a great city to regulate its own growth. The property right should be protected against any unwarranted invasion, but it should not be permitted to defeat legislation enacted by the city within the limits of its police power for the general benefit of its inhabitants. The evident design of the provision for side yards in the outlying zone areas was to prevent the indefinite extension of the city in compact

building formation. It was considered necessary from the standpoint of the public welfare that there should be some relief in the suburbs from the congested conditions existing in the sections of the city which have become densely populated. There could be no assurance of such an advantage to the people of the city if its building expansion must be continuously subject to the unregulated control of private individuals. In providing a comprehensive plan for the future growth of the city, the Zoning Ordinance presumably reflects the collective desire and judgment of the people of Baltimore with respect to that important public interest. The effort of the city to apply the limited measure of control specified in the ordinance, in regard to building areas, should be judicially sustained, if it bears a perceptible relation to any community interest for which the police power, delegated by the state to the city, can properly be invoked.

In the case of *Goldman v. Crowther,* 147 Md. 282, in which the provisions of the Baltimore Zoning Ordinance in reference to the use of property were held to be invalid, the decision reserved the question as to the constitutionality of the height and area provisions of the ordinance. Since that case was decided, the Supreme Court of the United States, in sustaining the general validity of the use, height, and area provisions of a zoning ordinance of the village of Euclid, in the State of Ohio, said, in the course of the opinion delivered by Mr. Justice Sutherland in *Euclid v. Ambler Realty Co.,* 272 U. S. 365: "There is no serious difference of opinion in respect of the validity of laws and regulations fixing the height of buildings within reasonable limits, the character of materials and methods of construction, and the adjoining area which must be left open, in order to minimize the danger of fire or collapse, the evils of overcrowding, and the like. * * *" The provisions of the Euclid ordinance in regard to building areas are analogous to those which are resisted in the present case. It was said by the Supreme Court in the *Euclid* case, that the question to be decided as to the validity of the ordinance was the same under both the Ohio and

federal constitutions, and consisted of the inquiry whether the ordinance violated the constitutional protection to the right of property "by attempted regulations under the guise of the police power, which are unreasonable and confiscatory." In its discussion of that question the Supreme Court said, in part:

"Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles, and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But, although a degree of elasticity is thus imparted, not to the meaning, but to the application of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall."

"The ordinance now under review and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegiti-

mate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. * * ** If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. *Radice v. New York,* 264 U. S. 292, 294."

The ordinance provision specially considered in this case does not prevent the use of the appellant's land for the residence purposes to which it is adapted and proposed to be used, but merely requires that a space for a side yard ten feet wide be reserved on each lot, if its size and shape admit of such a reservation without impairment of its proper utility. In view of the general and systematic application of the provision to future building development in the environs of Baltimore City, there is certainly no element of arbitrary discrimination or unreasonable classification involved. The observance of the house construction plan adopted by the ordinance would secure and preserve to the city an extensive suburban zone in which the homes needed for its future increase of population would be separated by open spaces enabling their occupants to enjoy improved ventilation and abundant sunlight. There can be no question as to the additional pleasure and comfort which would be thus afforded to those living in the zone of houses separated by the areas for which the ordinance provides, and the relation of such a general plan of municipal development to the public health and safety can be readily perceived. The separation of buildings has an obvious tendency to reduce fire hazards, and a freer admission of air and sunlight to the homes of the city is plainly conducive to the health of its people.

In considering the area provisions of a zoning ordinance, in *Wulfsohn v. Burden,* 241 N. Y. 303, the Court of Appeals of New York said: "The open spaces not only tend to minimize the dangers of fire to adjoining buildings and thus a spreading conflagration, but they also afford a greater

opportunity for access by fire departments to a burning building and thus increase the possibility of successfully stopping a conflagration before it spreads to other buildings."

The Supreme Court of Ohio, in *Pritz v. Messer,* 112 Ohio St. 644, said: "If a law regulating the air space which must be allowed in a tenement house has a reasonable relation to health, we cannot say that a measure which will save considerable districts for the city in which the air space is unblocked by massed building construction has no reasonable relation to health."

The fact that it is not feasible to make similar provisions for the central portions of the city cannot be successfully urged by the appellant as a reason why the health and safety of the suburban population should not be promoted. The entire city is concerned in the reduction of fire hazards and the protection of health in its suburbs.

In the case of *Byrne v. Maryland Realty Co.,* 129 Md. 202, upon which the appellant places special reliance, a statute requiring open areas to be reserved between dwellings in a comparatively small section of Baltimore was held to be unconstitutional. The opinion referred to surrounding conditions which made it apparent that the area requirement was not intended to protect the public health or safety. No question was presented and decided in that case as to the power of the city to regulate its development under reasonable area provisions of general application. There is consequently a material distinction between the *Byrne* case and the one now in course of decision.

In our opinion the area provision affecting this case is within the scope of the police power which the municipal government of Baltimore is entitled to exercise.

The contention is made that the ordinance is rendered invalid by its provision authorizing the board of zoning appeals to vary or modify any of its regulations, where there are practical difficulties or unnecessary hardships in the way of its strict enforcement, the expressed purpose being, however, that the spirit of the ordinance shall be observed. This

is said to be an unconstitutional delegation of unlimited discretion.   In *Goldman v. Crowther, supra,* while such an objection to the delegation of the power in question was sustained so far as the use provisions of the ordinance were concerned, the Court refrained from holding that the objection was available with respect to the height and area restrictions, but it was said in the opinion, delivered by Judge Offutt: "It does not necessarily follow that, because the standards and rules provided to control the exercise of the discretion vested in the board in passing upon the uses of property are too indefinite, that they are insufficient to limit and control that discretion when applied to the location and construction of buildings.   For in the one case, the subject of the discretion is intangible, impalpable, and aesthetic, while in the other it is material and substantial, and its physical incidents and consequences are capable of being positively and definitely ascertained."   The power of modification which the ordinance confers upon the board of zoning appeals in regard to the provision for side yards is to vary the dimensions of the specified areas only so far as may be necessary because of practical difficulties or unnecessary hardships. The discretion thus reposed in the board was manifestly intended to be exercised for the benefit of the property owner.   It is a limited discretion and is plainly essential to the practical application of the plan prescribed.   There is no invalidity in such a delegation of administrative authority.   This conclusion is amply supported by the recent decision in *Tighe v. Osborne,* 150 Md. 452, and by cases therein cited.

*Judgment affirmed, with costs.*

Offutt, J., filed a dissenting opinion as follows:

It is with some reluctance that I feel constrained to dissent from the very able and brilliant opinion filed by Judge Urner for the majority of the court in this case, but since it

presents and promulgates a construction of certain guaranties found in the constitution of this state, fundamentally different from that heretofore given them by this Court, and different from that which I believe to be sound, I can do no less.

It may be said too that this memorandum is filed in no spirit of criticism, for no one could hold in higher esteem the learning, the ability, and the high purpose of the members of this Court who adopted the majority opinion than I do, but is filed solely as an exposition of the reasons that induced the dissent.

The decision in the case immediately before the Court, compared with the theory upon which it is decided, the principles of constitutional construction which it establishes, and the easy way in which, as it appears to me, it sets aside prior decisions of this Court, is of little relative importance. It only declares the rights of a single person, but if its reasoning is to be accepted as the law of this state, then the rights, privileges, and immunities of every citizen of the state, in so far as they rest for protection upon the Constitution of the state, are profoundly affected.

The real question presented by the appeal is the constitutionality of the "area" provisions of certain ordinances of Baltimore City, collectively constituting what is known as the Zoning Ordinance. The majority opinion refers to that ordinance in very broad and general terms, but to understand the precise force and meaning of the opinion, it is necessary to refer more specifically to those parts of the ordinance which the opinion approves as valid and constitutional legislation. But before doing that reference may also be made to its purpose as declared in its preamble as evidence of the extent of the "police" power which the municipality undertook through it to exercise. In that preamble it is said: "Whereas it is deemed necessary in order to protect and promote the public health, safety, *comfort, convenience, prosperity* and *general welfare,* to establish a general zone plan which will insure a fair and adequate division of light and air among buildings, protect the residence districts, prevent congestion, lessen the

fire hazard, increase industrial and commercial efficiency, *conserve property values* and direct the building of the city in accord with a comprehensive plan for the use and development of all parts of the city;

"Now, therefore, be it ordained by the Mayor and City Council of Baltimore."

In pursuance of that purpose the ordinance "zones" the City of Baltimore with reference to the use, height, and area of all buildings to be erected therein. Although the terms "zone" and "zoning" are used, in fact, as indicated by certain plats integrated with the ordinance, it does not contemplate zoning in the literary sense of that word, but blocks off the city into a number of separated wholly distinct areas, irregular in size and shape, having no apparent or necessary relation to any general plan or scheme of development at all. It divides the entire city into six area districts, A, B, C. D, E, and F. In A area district, no dwelling "other than a hotel" may occupy more than seventy per cent. of the area of an interior lot, nor more than eighty-five per cent. of the area of a corner lot, and behind every building "except a hotel" there must be a yard as wide as the building, and one-third of its heighth in depth, and no side yard is necessary.

In B area district, "no dwelling other than a hotel shall hereafter be erected or altered to accommodate or make provision for more than eighty families on any acre of land, nor more than a proportional number of families on a fractional part of any acre of land," and in that area, in all blocks where ninety per cent. or more of the frontage of blocks between intersecting streets, "but excluding the frontage along the side line of a corner lot, is now improved with buildings for which front yards are provided, the depth of front yards of the buildings now existing shall be the depth of front yards required for future buildings."

In C area, no building used "in any part" for residence purposes, "other than a hotel," shall occupy more than sixty per cent. of an interior or more than seventy-five per cent. of a corner lot. In this area "multiple dwellings are allowed," but no dwelling shall be constructed excepting hotels which

will accommodate more than eighty families to the acre, and all buildings must have front yards varying in their dimensions according to the width of the street, or the prevailing dimensions of the lots in the block in which the building is to be located. Where fifty per cent. of the frontage in a given block is improved by buildings having front yards, the depth of such yards shall be the standard. But where not more than twenty per cent. of the frontage is improved by buildings having no front yards, the front yards of buildings to be erected shall be twenty per cent. of the depth of lots on that frontage in depth, not necessarily exceeding thirty feet.

In D area district, no building must occupy more than fifty per cent. of the area of an interior lot or more than sixty-five per cent. of a corner lot. Multiple dwellings must have a minimum space of five feet along their side lines, no dwelling shall be erected to accommodate more than forty families to the acre, and front yards in that area must conform to the requirements prescribed for C area district.

In E area, "no building hereafter erected shall occupy more than thirty per cent. of the area of an interior lot, nor more than forty per cent. of the area of a corner lot" and "in the E area district there shall be reserved on each lot at least one side yard not less than ten feet wide, except in cases where, because of the size and/or shape of any lot or tract, such requirement cannot be complied with or would render such lot or tract unfit for use, and in such cases the board of zoning appeals may reduce the requirement as it may deem reasonable and proper." No buildings to accommodate more than sixteen families to the acre shall be built; the front yards of houses on lots of one hundred feet fronting on fifty-foot streets shall be twenty-five feet deep, and as the street becomes wider the depth of the yard decreases in the ratio of one foot to five, and where the average depth of the lots is between one hundred and one hundred and twenty-five feet, the front yards must be thirty feet deep, and where they are over one hundred and twenty-five feet deep, the front yards

must be thirty-five feet. In other cases, the front yards must conform to the requirement provided for area C.

In F area "district, no building hereafter erected shall occupy more than twenty-five per cent. of the area of an interior lot nor more than thirty per cent. of the area of a corner lot," and in a residence district on a lot occupied by a semi-detached dwelling there shall be at least one side yard not less than fifteen feet wide, and on a lot occupied by a detached dwelling there shall be two side yards, each of which shall be not less than ten feet wide. No more than six families may be housed on an acre, rear yards are to be more than forty per cent. greater than in A area, semi-detached dwellings shall have side yards not less than fifteen feet wide, detached dwellings shall have two side yards each not less than ten feet wide, and front yards must conform to the requirements provided for E area.

In respect to C area, the board of zoning appeals may "authorize the construction of a building on such parcel of land with the required depth of front yard reduced to an extent necessary to secure an appropriate improvement thereof." In C and D areas, unenclosed porches may project not more than five feet into the front yard, but in E and F areas they may project ten feet. Where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of this ordinance and the maps which are a part hereof, the board of zoning appeals shall, with the concurring vote of five members, have the power, in passing upon appeals, to vary or modify any of the regulations or provisions of this ordinance, relating to the use, construction, or alteration of buildings or structures or the use of land, so that the spirit of the ordinance shall be observed, public safety and welfare secured, and substantial justice done. The rule that the board of zoning appeals shall follow, in deciding the various questions referred to in this ordinance, shall be the protection of living conditions as far as reasonable or the prevention of serious injury to the appropriate use of neighboring property. The ordinance further provides that

"it shall be unlawful to use or permit the use of any building or land or part thereof hereafter created, erected, altered, changed or converted wholly or partly in its use or structure until a certificate of occupancy to the effect that the building or land or the part thereof so created, erected, altered, changed or converted and the proposed use thereof, conform to the provisions of this ordinance, shall have been issued by the zoning commissioner."

The word "district," used in these area provisions of the ordinance, is quite inaccurate and wholly misleading. As used in the ordinance it might well give the impression that a given "area district" is a single piece, parcel or tract of land, whereas the plat which is a part of the ordinance shows it to be a group of separate independent parcels of land, not connected in any way, scattered here and there over the whole city, and designated with no apparent relation to any standard, guide, or plan, other than the legislative will.

The theory that such regulations have any actual or real relation to what is known as the police power of the state is manifestly untenable, unless the enhancement of the value of the property of one citizen at the expense of another is a legitimate exercise of that power.

To attempt at this time and in this connection any elaborate review of the cases defining the police power is unnecessary and wholly unprofitable. Although not susceptible of any narrow or precise definition, the actual power itself, historically treated, is very well understood everywhere and by all courts, and there is usually little difficulty in testing its application in a given case. It is only where its application is complicated by considerations of expediency or convenience that the term "police power" has recently been broadened so as to afford an adequate escape from constitutional prohibitions which cannot otherwise be amended without difficulty and inconvenience, and as thus used it can neither be defined nor limited. Because until occasion arises to invoke its application, it is impossible to say how far it must be stretched to meet the requirements of some act or

measure contrary to constitutional prohibitions. Few attacks on constitutional guaranties are attempted which are not based upon that view of the police power, which is that any constitutional provision which conflicts with the public "convenience," "comfort," "prosperity," or "general welfare" can be disregarded, and that every statute or ordinance adopted by a legislative body to regulate conduct or the use of property must be conclusively presumed to be in furtherance either of the public convenience, comfort, prosperity, or general welfare, so that every ordinance or statute, whether in conflict with a written constitution or not, is valid.

That view of the police power has never obtained in this state, although it has been widely accepted elsewhere, but the uniform policy of this Court heretofore has been to treat the Constitution as an actual and tangible limitation upon the power of the people, the courts, the legislature, and the executive to invade the rights of the individual, but it seems to me that it must be adopted now if the ordinance under consideration here is to be sustained.

Under that ordinance six different tracts of ground, owned by six different persons, but similar in their topography, in their relation to public highways, in the development and improvement of the adjacent territory, in the advantages of fire, police, and sanitary protection available, may arbitrarily and without any reason except the legislative will be classified as lying respectively within A, B, C, D, E, and F areas. So that while the owner of one of these tracts may cover seventy-five per cent. of it with a dwelling, the owner of another may only use twenty-five per cent. of it for that purpose; while the owner of one lot may house eighty families on an acre of ground, the owner of another may only house six; while the owner of one lot must provide front, side, and rear yards, the owner of another need only provide a rear yard. Such regulations have no visible relation to the public health, safety, or morals, but have a wholly different purpose, and are designed, as the ordinance itself states, to effect a scheme which will in the judgment of the Mayor and City Council

promote the public comfort, convenience, prosperity, and general welfare, and conserve property values. Heretofore the only limitation upon the use of private property has been that the owner thereof should not so use it as to imperil the public safety, health, or morals. And the right to so use property has been regarded as a tangible property right within the protection of such constitutional guaranties as are found in article 23 of the Maryland Declaration of Rights, and article 3, section 40 A, of the Maryland Constitution, for property without the right to use it is valueless. And in speaking of those provisions of the Constitution, this Court said in *Arnsperger v. Crawford,* 101 Md. 251, *et seq.*:

"Section 40 of article 3 of the Constitution of Maryland provides: 'The General Assembly shall enact no law authorizing private property to be taken for public use, without just compensation, as agreed upon between parties, or awarded by a jury, being first paid or tendered, to the party entitled to such compensation,' and article 23 of the Declaration of Rights declares that 'no man ought to be taken, or imprisoned, or disseized of his freehold liberties or privileges, or outlawed, or exiled or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or by the law of the land.' There is no prohibition in express terms against taking private property for private use, to be found either in our Constitution or Declaration of Rights, nor can it be justly held that any is needed, although such a prohibition is contained in the Constitutions of Alabama, Colorado, Georgia, Louisiana, and Missouri. The implied prohibition contained in section 40 of article 3 is too clear to be questioned. * * * And Judge Alvey in *New Central Coal Co. v. George's Creek Coal Co.,* 37 Md. 559, said: 'This constitutional prohibition is but declaratory of the previously existing universal law which forbids the arbitrary and compulsory appropriation of any man's property to the mere private use of another, even though the compensation be tendered.'

"It has never been anywhere held that this can be done, so that our only inquiry here is whether this particular use is a

'public use,' within the meaning of the Constitution. When
this is determined, the question before us is solved, and all
the authorities hold that whether a use is public or private,
is a question, not for the Legislature, but for the judiciary.
*Lewis on Eminent Domain,* sec. 158; *New Central Coal Co.
v. George's Creek Coal Co.,* 37 Md. 560. The Legislature
cannot make a particular use either public or private, merely
by so declaring it. If it could do so, 'the constitutional re-
straint would be utterly nugatory,' as was said in the case
last cited. * * * There will be found two different views of
the meaning of these words which have been taken by the
courts: one, there must be a use, or right of use by the pub-
lic, or some limited portion of the public; the other that they
are equivalent to public utility or advantage. If the former
is the correct view, the Legislature and the courts have a defi-
nite, fixed guide for their action; if the latter is to prevail,
the enactment of laws upon this subject will reflect the pass-
ing popular feeling, and their construction will reflect the
various temperaments of the judges, who are thus left free
to indulge their own views of public utility or advantage.
We cannot hesitate to range this Court with those which hold
the former to be the true view."

But if the Legislature, or the Mayor and City Council as
its delegate, can say to the owner of a lot of ground, "You
cannot erect any dwellings on your property which will cover
more than twenty-five per cent. of the area thereof," or to the
owner of an acre of land, "You cannot erect any dwellings
on that acre which will house more than six families, not that
you will thereby endanger the public health, morals, or safe-
ty, but because it may affect the public prosperity," then we
must adopt the principles which this Court in *Arnsperger v.
Crawford, supra,* denounced, for we hold, first, that whether
a use is public or private is a legislative and not a judicial
question, and second, that any use is public which is "to pub-
lic utility or advantage."

As stated above, there is no present necessity for review-
ing the many decisions of this Court stating over and over
again the principles recognized in *Arnsperger v. Crawford,*

since they are referred to in cases so recent as *Goldman v. Crowther,* 147 Md. 282; *Tighe v. Osborne,* 149 Md. 349, and *Tighe v. Osborne,* 150 Md. 452, but it may be noted that, beginning with the case of *Byrne v. Md. Realty Company,* 129 Md. 210, there has been a series of determined assaults upon the soundness of those principles, and perhaps the best exposition of the theory and policy underlying those attacks is to be found in the dissenting opinion of Chief Judge Bond in *Goldman v. Crowther, supra,* in which in part he says: "The portion of the ordinance with which we now have to deal is a deliberate effort to separate the business of the city from the dwellings in so far as that is practicable in an old city. That is precisely what we are to consider, and all we are to consider. And we are to decide whether the deprivation of any owners of so much of their freedom in the control or use of their properties in order to accomplish that end can be considered within the scope of the powers committed to the government. * * * For a long time now, efforts have been made in the development of new residential areas in the city to prevent the environment objected to by covenants in deeds, but this has not proved entirely successful; and, if successful, restrictions by this means are not entirely desirable, because they continue and bind the areas to which they are applied indefinitely in the future, in spite of almost all change, and so may become too burdensome to property owners there in course of time. * * * This aversion to the proximity of business uses may all be without any basis in reason, but it is nevertheless real, and the law cannot disregard the real importance of the illogical in practical affairs. * * * Upon these considerations, the conclusion of Judge Urner and myself on the first and main question, whether this ordinance can be said to have a purpose which it is the function of the government to effectuate, is that it can be. We take the view that the possibilities pointed out for improvement in living conditions, and in the handling of administrative problems, may well have justified the adoption of the separation of business and the dwelling places for the future, under the police power, and that this measure of co-operation required of the

citizens is one which the judges cannot say is arbitrary or unnecessarily oppressive." In *Tighe v. Osborne,* 149 Md. 369, Judge Urner, in a dissenting opinion, in speaking of the "use" provisions of Ordinance 334, said: "Ordinance No. 334 of the Mayor and City Council of Baltimore is in my opinion a valid enactment. It indicates no purpose to extend its operation beyond the proper limits of the police power which the State has authorized the city to enforce. Adequate protection of individual rights is afforded by provisions for administrative investigation and review of the facts and merits of each case to which the ordinance may apply, and for a judicial determination as to the legality of any action by which an interested person may be aggrieved. I see no justification in the record for the appellant's refusal to submit her application for a building permit to the processes of inquiry and decision which the ordinance prescribes."

But the contrary view was expressed in *Byrne v. Md. Realty Co., supra,* in *Goldman v. Crowther, supra,* and in the two case of *Tighe v. Osborne, supra,* in which cases it was held that the police power could not be invoked to justify the invasion of private rights except where necessary to protect the public health, morals, or safety; in *Bostock v. Sams,* 95 Md. 400, and *Stubbs v. Scott,* 127 Md. 86, where it was held that a mere desire for uniformity in the size and style and use of buildings was not sufficient to invoke the police power in support of regulations designed to secure that uniformity at the expense of private rights; and in *Byrne v. Md. Realty Co., supra,* and *Osborne v. Grauel,* 136 Md. 92, where it was held that mere aesthetic considerations were not sufficient to invoke the police power.

But an examination of the ordinance demonstrates that it does the very things which this Court, in the cases to which we have referred, said could not legally be done, and in accepting it as a valid exercise of the police power, this Court for the first time in its history recognizes that the police power may be invoked to support legislation appropriating private property to a public use without compensa-

tion, when considered by the legislative authority to be for the "public utility and advantage."

As to that view of the power, this Court, in *Arnsperger v. Crawford, supra,* said: "The enactment of laws upon this subject will reflect the passing popular feeling, and their construction will reflect the various temperaments of the judges, who are left free to indulge their own views of public utility or advantage." Nor is this case wholly without value as an illustration of the force of that comment.

That the provisions of the ordinance under review here do not have any real relation to the police power, according to the settled and established law of this state, is apparent on the face of it. Provisions that fourteen persons, if composing a single family, may live on a single acre of ground, but that they cannot live there if they compose more than six "families," or that eighty families may dwell on an acre of ground on one side of an imaginary line, while on the other side of it only six may dwell on an acre, or that in one area the owner may not erect a dwelling to occupy more than twenty-five per cent. of a given lot, while the owner of a similar lot practically adjacent to it, but in another "area," may erect a dwelling to occupy sixty per cent. of it, that the owner of one lot must provide a side yard ten feet wide, while his neighbor owning a lot which may be adjacent to it need not provide any, have no apparent relation to the public health, safety, or morals, and it would be a waste of time to demonstrate the obvious by laboring further to prove what cannot well be denied. The ordinance is nothing more nor less than a vast, comprehensive, and complete plan or scheme of segregation, under which the population of the city in respect to their dwelling places are graded and classified according to their means. So that in one section the inhabitants may dwell only in dwellings surrounded by yards and gardens and spacious grounds, while in another they may dwell in houses built in solid blocks. Heretofore that result has been possible only by contract, by incorporating restrictions in deeds, a process necessarily slow and only occasionally possible, but, with the adoption of the modern view of the

police power, the same result can be reached immediately and in all cases, and even existing restrictions, where they conflict with the police power, must give way. For under that view of it, the mere fact that one had covenanted to erect on a given lot a building of given size and cost would amount to nothing under an ordinance which prohibited the construction of such a building, by forbidding the owner from using so much of his lot as was necessary to comply with his covenant. Whether such a policy is sound, or whether the plan adopted is demanded by the complexity and the severe wear and tear of modern conditions, is not a judicial question, for the courts are to interpret and not to make law. We have a Constitution, and we are bound by it. When it becomes archaic and a hindrance to progress, the people who adopted it can change it, for that is their exclusive privilege, and the right to change it is not within the power of the courts or the Legislature, and until it is changed, it is, or should be, the law. That such legislation as this does invade constitutional rights and guaranties which have been recognized and respected since Runymede cannot well be questioned. And indeed so much is conceded in the case of *Euclid v. Ambler Realty Co.,* 272 U. S. 365, upon which the majority opinion rests, for in that case the Court says: "With the great increase and concentration of population, problems have developed, and constantly are developing, which require and will continue to require additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive." But the Court in that case goes on to say, that there is no inconsistency in that, "for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. * * * But although a degree of elasticity is thus imparted, not to the executing, but to the application of

constitutional principles, statutes * * * which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course must fall." Difficult as it is to follow the reasoning which permits the appropriation of private property to a public use without compensation while still preserving inviolate and unchanged the letter and meaning of a constitutional provision prohibiting such an appropriation, it is even more difficult to attribute any real efficiency to any constitutional guaranty at all under the rule of construction established by this case. For it substitutes for the guaranties found in the fixed and definite language of the Constitution, so vague a formula as "the exigencies arising from new and different conditions," and tests the validity of legislation by its necessity to meet changing conditions "in a changing world." For the Court, in sustaining the ordinance involved in this appeal, predicates its conclusion upon these propositions, which it assumes: (1) that the purpose of the ordinance under consideration is "to regulate building expansion of the city over the open area available for its development"; (2) that the limitations placed by it upon the rights of the owners of the property affected can only be justified by an exercise of the police power; (3) that such property rights conflict with "the desire of a great city to regulate its own growth," and should not, therefore, be permitted to halt legislation enacted by the city "within the limits of its police power" for the general benefit of its inhabitants; (4) that the Zoning Ordinance "presumably reflects the collective desire and judgment of the people of Baltimore with respect to that important public interest"; (5) and should be sustained if it bears any "perceptible" relation to "any community interest" for which the police power can "properly" be invoked.

If those propositions are all of them sound, then any private right whatever may be destroyed by any legislation which bears any "perceptible" relation to any community interests for which police power may "properly" be invoked. And since it quotes with approval language extending the police power to any matter affecting the public welfare, and treats the "desire of a great city" as equivalent to the public wel-

fare, and the ordinance as conclusive evidence of this desire, it follows that no private right can be said to be beyond the destructive reach of the police power, when it conflicts with the will of the majority of a legislative body.

While that may be the law elsewhere, the contrary view was asserted by this Court with great force and clearness in *Byrne v. Md. Realty Co.,* 129 Md. 209, and in my opinion this case cannot be distinguished from that. For with the utmost deference for the views of the majority, I do not think that the fact that the present ordinance embraces more territory than was involved in that case affects the constitutional principles involved. Nor can I accept the view that the result in this case can be justified by the theory that the "desire of a great city to regulate its own growth" bears a "perceptible" relation to the police power. There are no standards or guides provided by which the various areas are to be designated, limited, or selected, but the selection is committed to the arbitrary and uncontrolled discretion of the Mayor and City Council of Baltimore City, and its judgment is a final and conclusive fiat which may not be reviewed by any other authority whatever. To me that seems to be nothing more or less than the appropriation of private property to public use without just compensation, and without due process of law. If one purchases a lot intending to build a home thereon large enough for his needs, and, after he has bought it, is forbidden to construct such a building thereon, for no other reason than that the Mayor and City Council believe that he should build a smaller house, his property is in effect taken from him.

It is true that in some cases the ordinance gives the zoning officials the power to set aside in their discretion its area provisions, but that power is likewise arbitrary, uncontrolled and unlimited by any guide or standard, and the right of the citizen to the use and enjoyment of his property has not heretofore been supposed to rest in the will and discretion of officials, but in the positive guaranties of the constitution.

Serious and important as is the determination of the precise case before us, the reasons and the rules adopted for deciding it are vastly more important. For while in this case the citizen is only deprived of his property, he may by the same process be deprived of any other privilege guaranteed by the constitution, such as the privilege of trial by jury, freedom of speech, and religious freedom, protection against unreasonable search and seizure, and freedom of the press, which he has been accustomed to regard as essential to his happiness. Because if any constitutional provision, as clear as that which provides that the citizen may not be deprived of his property without just compensation, may be set aside by any act which bears any "perceptible" relation to the public welfare, and what is the public welfare is to rest finally in the discretion of a selected body of officials, then no such provision can be said to offer any real protection to the citizen in the enjoyment of any right, privilege, or immunity.

I am authorized to say that Judge Digges and Judge Parke concur in these views.